138 So.2d 558

Jackson B. DAVIS

v.

E. C. LASTER and Mrs. Eugenia F. Laster.

No. 45739.

Feb. 19, 1962.

Rehearing Denied March 26, 1962.

Phillips, Risinger & Kennedy, Shreveport, for relators.

Simon Herold, Shreveport, for respondent.

SUMMERS, Justice.

Plaintiff lessor sued to cancel an oil, gas and mineral lease. The Trial Court rejected this claim. The Court of Appeal reversed the Trial Court and ordered cancellation of the lease. Certiorari was granted upon the application of defendant lessees to review the judgment of the Court of Appeal. (See 130 So.2d 479)

On January 16, 1947, Elizabeth W. Pegues and Boykin W. Pegues, as lessors, executed an oil, gas and mineral lease to Fred L. Kyle, as lessee, affecting 772 acres of land owned by them in DeSoto Parish, Louisiana. The lease provided for a primary term of ten years.

The mineral lease was thereafter acquired by defendants, E. C. Laster and Mrs. Eugenia F. Laster, insofar as it covered 480 acres thereof, including the land here involved.

In September 1948, the defendant lessees drilled a well on the leased premises in the Southeast Quarter of the Northwest Quarter of Section 34, Township 15 North, Range 14 West, which was completed as a gas well capable of producing in paying quantities between five and six million cubic feet of gas daily on open flow potential tests, according to tests made by a representative of the Commissioner of Conservation and a representative of lessees. The well, known as Pegues No. 1 Well, having been completed and potential tests having been made, was shut in for lack of a market for the gas. This well was then the only well producing gas in the area, and no purchaser of gas would undertake the expense of laying a line to receive and market the production from this well alone. Some gas was produced from the well for use in drilling operations in the vicinity of lands other than the leased premises.

Lessees had drilled two wells in the area prior to drilling the Pegues No. 1 Well. After completing the Pegues No. 1 Well they drilled nine more wells in the area of, but not on, the leased premises in an effort to find additional gas production which would warrant the laying of a pipeline into the area to market the gas. However, these wells drilled by lessees were all nonproductive.

The cost incurred in drilling the Pegues No. 1 Well was $89,736.59. Subsequent to the drilling of the Pegues No. 1 Well, in their effort to find additional gas production in the area, the lessees expended $304,117.78 more in the drilling of nine dry holes. Sinclair Oil and Refining Company, however, did find gas production in two of the seven wells they drilled on their own leases in the area, and lessees joined with the

operator of these Sinclair wells and thereby secured a gas line connection to the wells. This line was being laid when this suit was filed in February 1958.

Lessees, with a delivery line available, contracted to sell gas from the Pegues No. 1 Well to Arkansas-Louisiana Gas Company, and the well was given a daily allowable of one million cubic feet per day. Commencing May 13, 1958, after the suit was filed, the well began deliveries of gas, and, through January 1960 has produced 419,-519 MCF of gas with a net ⅝ths value of $44,080.91, and 2,690.69 barrels of condensate with an ⅝ths value of $7,264.88.

In the course of these events, on January 16, 1952, lessees had released and relinquished their rights in the mineral lease except insofar as it affected 180 acres consisting of the West Half of the Northeast Quarter, the Southeast Quarter of the Northwest Quarter of Section 34, and the Southwest Quarter of the Southeast Quarter, and the South Half of the Northwest Quarter of the Southeast Quarter of Section 27, all in Township 15 North, Range 14 West.

Elizabeth W. Pegues having died on December 21, 1949, Boykin W. Pegues was recognized as her universal legatee and sole heir. On September 8, 1955, he sold the entire Pegues tract, including the 180 acres affected by the lease which lessees had not relinquished, to Riemer Calhoun subject to a prior sale of one-fourth of the minerals

therein to S. E. Lyons, and reserving an additional three-eighths of the mineral rights to himself. On September 13, 1955, Riemer Calhoun sold the tract to the plaintiff, Jackson B. Davis, who thereby became the owner of three-eighths of the mineral rights in the 180 acres of land which lessees contend is still subject to the mineral lease.

Early in 1958, prior to the filing of this suit, defendants applied to the Louisiana Commissioner of Conservation for the designation of a producing unit for the Pegues No. 1 Well; and, after the hearing, the Commissioner issued an appropriate order dated April 22, 1958, effective May 1, 1958, designating a 360-acre unit for said well composed of the Northwest Quarter, the West Half of the Northeast Quarter, the North Half of the Southwest Quarter, and the Northwest Quarter of the Southeast Quarter of Section 34. This unit included the Southeast Quarter of the Northwest Quarter, and the West Half of the Northeast Quarter of Section 34, which is described in the contested mineral lease.

Upon the completion of the Pegues No. 1 Well, and having shut it in in 1948, as aforesaid, the defendant lessees continued to pay the annual delay rentals stipulated in the lease. After the 1952 release of the lease as to all but the 180 acres, these rental payments were made to cover the 180 acres retained under the lease. These annual rental payments, each in the total amount of $180.00, were made to cover each annual

·period of the lease until the expiration of the primary term on January 16, 1957, and were accepted by the lessors, including plaintiff herein.

Prior to expiration of the primary term of the lease, defendant lessees tendered their check dated December 28, 1956, in the sum of $18.75, to plaintiff lessor in payment of plaintiff's three-eighths portion of the $50.-00 per year shut-in royalty, as stipulated in Article 3(c) of the lease, for the period commencing with the expiration of the primary term on January 16, 1957, to January 16, 1958. Plaintiff lessor refused to accept this tendered payment, and by letter dated October 30, 1957, demanded of the lessees a release of the mineral lease. Prior to January 16, 1958, by check dated January 2, 1958, lessees tendered to plaintiff lessor the same sum in payment of shut-in royalty for the period January 16, 1958, to January 16, 1959. As stated before, actual production of gas from the well commenced on May 13, 1958. Plaintiff lessor, maintaining that the lease expired at the end of the primary term, has refused to accept the shut-in royalty or production royalty as stipulated in the lease, and here sues for its cancellation. Defendant lessee, E. C. Laster, died after this suit was filed, and Mrs. Eugenia F. Laster, as the Testamentary Executrix of his Succession, was substituted as a defendant for him.

The issue for decision thus presented is whether or not the oil, gas and mineral lease granted by Elizabeth W. Pegues and Boykin W. Pegues, as lessors, on January 16, 1947, and held by the defendants, as lessees, is still in force and effect as to the three-eighths ($\frac{3}{8}$ths) mineral ownership of the plaintiff in the West Half of the Northeast Quarter and the Southeast Quarter of the Northwest Quarter of Section 34, and the Southwest Quarter of the Southeast Quarter and the South Half of the Northwest Quarter of the Southeast Quarter of Section 27, all in Township 15 North, Range 14 West, DeSoto Parish, Louisiana.

The pertinent articles of the lease are:

"2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called 'primary term') and as long thereafter as oil, gas or other minerals are produced from said lands or land with which said land is pooled hereunder.

"3. The royalties to be paid by lessee are:

\* \* \* \* \* \*

"(c) Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50.00 per well, per year, payable quarterly, and

upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract.

"4. If operations for drilling are not commenced on said land on or before such anniversary date lessee shall pay or tender to lessor * * * the sum of one dollar per acre * * * (herein called rental) which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. * * *"

"5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter or (if it be within the primary term) commences additional drilling operations or commences or resumes the payment or tender of rentals on or before the rental paying date * * *."

The lessees' first complaint and assignment of error is that the opinion and decree of the Court of Appeal erroneously holds that lessees' failure, during the primary term of the lease, to tender and pay shut-in royalty upon a gas well drilled, completed and shut in for lack of a market or demand for gas, was a violation and breach of the lease working its forfeiture. It is asserted that this error occurred because the Court did not recognize that the shut-in royalty provision of the lease, Paragraph 3(c) which is quoted supra, is identical with the shut-in royalty provision contained in the lease involved in Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615. It is urged that, by that decision, such a proviso, and the word "may" used therein, "makes it optional with the lessee to make such payments if he wants it 'to be considered that gas is being produced'" within the meaning of the habendum clause in the lease. The habendum clause of the subject lease provides that lessees' interest is vested for a definite term of years—called the primary term—and as long thereafter as oil, gas, or other minerals are produced.[1]

We understand this contention of the lessees to mean that the quoted clause under Louisiana law is permissive, that is, it is an option granted to the lessees to maintain the lease in force in one of two ways—by the

---

1. 2 Summers Oil & Gas § 281–307 (perm. ed. 1959); Veasley, The Law of Oil & Gas, IV, 19 Mich.L.Rev. 161.

payment of delay rentals or the payment of shut-in royalties.

It is significant that Article 3(c) specifically designates as "royalty" the payments for wells producing gas only which cannot be marketed. Furthermore, by its position and context in the lease, Article 3(c) is associated with and falls under Article 3 which concerns the payment of royalties, thereby imparting to Article 3(c) a meaning associated with that context which requires the conclusion that the parties literally sought to designate the payments as royalty. Risinger v. Arkansas-Louisiana Gas Company, 198 La. 101, 3 So.2d 289; Moses, Problems in Connection with Shut-In Gas Royalty Provisions in Oil and Gas Leases, 23 Tul.L.Rev. 374. Also, 27 Tul.L.Rev. 478; and 10 Loyola L.Rev. 1; Morriss v. First National Bank of Mission, Tex.Civ.App., 249 S.W.2d 269; Malone, The Shut-In Royalty, 11 Baylor L.Rev. 19; Walker, Clauses in Oil and Gas Leases Providing for the Payment of an Annual Sum as Royalty on a Nonproducing Gas Well, 24 Tex.L.Rev. 478. No reason is apparent which would permit the interpretation that the language of the option granted by Article 3(c) permits the payment of annual delay rentals after drilling operations have resulted in a shut-in well. This is true because rental payments under Article 4 are designed only to grant the privilege of deferring commencement of drilling operations. Once, therefore, drilling operations have commenced, the lessees are relegated to continuing drilling operations, or the payment of shut-in royalties, or actual royalties to maintain the lease, or, where production *ceases*, resumption of delay rentals is authorized by Article 5.

Lessees contend that Article 5 permits a resort to delay rentals after a well has been shut in on the basis that shutting in of the well is contemplated in the language of Article 5, permitting the resumption of rental payments where the "production * * should *cease* from any cause". This argument is without merit. A shut-in well is not dry, and, although not actually producing, it is unrealistic to say that production has ceased within the established meaning of these words. The very purpose of the shut-in well clause of oil and gas leases is to permit the lessees to maintain the lease as though it were producing. Article 3(c) refers to and gives emphatic meaning to that construction in these words: "and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract". Article 2, commonly called the habendum clause, provides for the maintenance of the lease "as long * * * as oil, gas or other minerals are produced". Shut-in wells enable the lessor to maintain the lease by the payment of shut-in royalties and hence the production, though not actual, is a substitute for actual production and is, therefore, constructive production. Another convincing factor which persuades us to consider these

shut-in payments as royalties, and not as annual delay rentals, is the proviso that these payments are not payable on the annual rental-paying date designated for rental payments. Rather, shut-in payments are by the terms of the lease payable "quarterly".

The parties to the contract, having defined the terms used, and having applied rental payments to one situation and royalty payments to another, (the first applicable to a situation where commencement of drilling operations is to be deferred and the latter to be applicable where drilling operations have resulted in a well producing gas only for which no market exists), it follows that once drilling operations result in production, either actual or constructive, the lessees may no longer resort to rental payments, except where production should cease, in which event Article 5 would permit the resumption of rental payments.

The result, under the facts of this case, is that the option granted by "may" in Article 3(c) is the option to pay shut-in royalties or resume drilling operations under the terms of the lease.

The importance of the choice available to lessees after production has been obtained and the well is shut in is readily apparent when consideration is accorded to the fact that the shut-in payments which lessees may make, having been designated by the parties as royalty, allow others besides the mineral owner-lessor to become entitled to these payments. In many instances the mineral-owner lessor has sold royalties, and the royalty owners thereby created do not enjoy the right to participate in bonus and rentals under the lease due the mineral-owner lessor, but these nonparticipating royalty owners do become entitled to their acquired portion of royalties. To permit the lessees to elect to pay rentals where royalties are due would be to invest them with the power to foreclose nonparticipating royalty owners from receipts to which they are entitled under the lease.

It is understood that no claim is here asserted by the owners of nonparticipating royalty, but the consequences of the language which we are charged with interpreting are important in determining the meaning to be ascribed thereto. It is proper to explore these consequences in aid of our search for the true meaning of the contract before us.

Lessees' reliance upon the option granted in Article 3(c) is without merit according to a strict construction of the language of the contract. He cannot pay delay rentals when royalties are required. This case, however, is not resolved by the foregoing interpretation of the lease. If there existed grounds for uncertainty in the meaning of the option in the shut-in clause which we have found the lessees erroneously exercised, by paying delay rentals when shut-in royalties were due—which lessor erroneous-

ly accepted—then, because of the uncertainty of the language and the dearth of jurisprudence in our State interpreting similar lease provisions, there is ample authority in our law to support the proposition that the parties to this lease by their conduct in its execution varied its terms.

The principle is established by the positive law of this State that agreements legally entered into have the effect of laws on those who have formed them and they cannot be revoked, unless by mutual consent of the parties or for causes acknowledged by law. LSA–Civil Code, Art. 1901. It is the exception to the rule, where modification takes place by mutual consent, which addresses itself to the facts of this case. Have the parties modified their contract by mutual agreement?

Particularly, it is observed that authority exists in our law to support the proposition that the parties to a lease, by paying and accepting rentals, have themselves construed their contract in that respect.

Article 1956 of the LSA–Civil Code declares:

> "When the intent of the parties is *doubtful*, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."
> (Italics ours.)

That the language of the lease permitted doubt concerning the intention of the parties is demonstrated by the varying views adopted by the courts and legal scholars when beset by the problems we have discussed.[2] No expression of opinion from this Court directly on point has heretofore been recorded relating to the interpretation of similar lease provisions.

▬  Important, too, as an aid in our search for the meaning the parties intended by their contract, are the actions of the parties themselves; for even when the contract is assumed to contemplate a different course of action, the jurisprudence, under Article 1956 of the LSA–Civil Code, supra, has held the parties bound by the action taken and consented to in the performance of their contractual obligations. Pendleton v. McFarlane, 222 La. 569, 63 So.2d 1; Stamm Scheele, Inc. v. Loewer, La.App., 149 So. 903; Wilcoxin v. Bowles, 1 La.Ann. 230.

▬  Articles 1817 and 1818 of the LSA–Civil Code recognize that silence or inaction of the lessor can result in the conclusion that he has consented to a different mode of execution than that expressed in the agreement. These codal articles are applicable to the lease before us, for, by the jurisprudence of this State, oil and gas leases are to be governed by the codal pro-

---

2. 11 Baylor L.Rev. 19. and authorities therein cited.

visions applicable to ordinary leases. Coyle v. North American Oil Consolidated, 201 La. 99, 9 So.2d 473; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336.

■ Courts do not attribute a different meaning to a contract than that which the parties have expressed. Nevertheless, when the parties themselves have established by their acts a different mode of execution, and their actions, under those circumstances, may more clearly denote their appreciation of the meaning they intend to be imparted to their contract than the language itself, then, the result is that a departure from the strict language of the agreement has been consented to by the action of both parties. It is only in such clearly established cases that courts may depart from the language of the agreement, which is the law of the case between the parties.

The delay rentals tendered by lessees and accepted by lessor were much in excess of the shut-in royalty, the lessor having paid $180 as delay rentals, when $50 would have been due as shut-in royalty. What wrong has lessor suffered thereby? These delay rentals were accepted by lessor without complaint for nine long years, which, together with the fact that there is no suggestion in the case at bar of a refusal to pay shut-in royalties had lessor required their payment, distinguishes this case from Melancon v. Texas Company, 230 La. 593, 89 So.2d 135, and Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132, relied upon by lessor. Furthermore, it should be obvious, if the lessor had ever suggested that he should have been paid shut-in royalties in lieu of delay rentals, the lessees in their own interest would have readily complied, inasmuch as by so doing a saving to lessees would have resulted. It cannot be presumed that the course of action pursued by lessees, more onerous to themselves and more beneficial to lessor, was resorted to in an effort to deprive lessor of some right to which he was entitled.

The whole record clearly negatives any inference that the lessees were unable to perform according to the contractual provision. Likewise, it leaves no doubt that lessees were in good faith in their effort to comply. Nor is any contention made that the lessees have not exercised due diligence in their effort to market the gas in the shut-in well. The substantial expenditures and the many wells drilled in the area to discover sufficient gas reservoirs to make the laying of a pipeline economically feasible are ample evidence of lessee's good faith. Gennuso v. Magnolia Petroleum Company, 203 La. 559, 14 So.2d 445; Risinger v. Arkansas-Louisiana Gas Company, 198 La. 101, 3 So.2d 289; Lelong v. Richardson, La. App., 126 So.2d 819.

■■ Also, it is noted that:

"In Louisiana, the right to dissolve a lease is subject to judicial control

according to the circumstances. Brewer v. Forest Gravel Company, Inc., 172 La. 828, 135 So. 372, and cases there cited. In this case there were grounds for honest doubt as to the rights of the parties. This Court has not, and will not, penalize a litigant lessee by dissolving a lease held technically in default when there is a bona fide defense. The plaintiffs request for cancellation should, therefore, be denied." Rudnick et al. v. Union Producing Co. et al, 209 La. 943, 25 So.2d 906.

and,

"There is ample authority for the proposition that considerations of equity may prevent a forfeiture of a mineral lease where the failure of the lessee to pay the full amount of the delay rentals, or his failure to pay it within the time stipulated, is the result of a mistake on his part, and where the circumstances are such that the mistake is a pardonable one, and *particularly where the mistake is a mutual mistake on the part of both the lessor and lessee*. In such cases equity requires that when the lessor learns of the mistake he should promptly inform the lessee of the mistake and give the latter an opportunity to correct it immediately, before he, the lessor, can demand a forfeiture for nonpayment of the rental within the time stipulated. See Monarch Gas Co. v. Roy et al., 81

W.Va. 723, 95 S.E. 789; and Gloyd v. Midwest Refining Co., 10 Cir., 62 F.2d 483." (Italics ours.) Jones v. Southern Natural Gas Company, 213 La. 1051, 36 So.2d 34. Also, Atlantic Refining Company v. Shell Oil Company, Inc., 217 La. 576, 46 So.2d 907; Sohio Petroleum Company v. V. S. & P. R. R. et al, 222 La. 383, 62 So.2d 615.

It results from the facts and the authorities relied upon that lessor cannot obtain forfeiture and cancellation of the controverted lease on the basis that lessees paid the delay rentals when shut-in royalties were due.

The controversy is not terminated by this conclusion, however, for other conduct of the lessees is relied upon by lessor as a basis for the forfeiture of this lease. One of these grounds is that lessees did not maintain the lease in force beyond the primary term when lessees tendered the shut-in royalty just prior to the end of the primary term.

The plain language of the lease contract provides for its termination at the end of the primary term, unless it can be considered that oil, gas or other minerals are being produced from the leased premises or lands pooled therewith. The production required to maintain the lease must be either actual or constructive. It is not actual production here. Lessees, by paying the shut-in royalty prior to the expiration of the primary term,

seek thereby to put constructive production into operation effective with the expiration of the primary term and thereby continue the life of their lease.[3]

The shut-in clause is specifically designed to enable the lessees to protect their investment in a shut-in well beyond the primary term—for, at the expiration of the primary term, they can no longer pay delay rentals to maintain the lease and they cannot produce the gas from the well they have discovered where no market is available. Therefore, if it were not for the shut-in clause, and the constructive production resulting from its application, the lease would be forfeited for expiration of its term at the end of the primary term.

It is argued on behalf of the lessor here that, inasmuch as lessees elected to pay delay rentals *during the primary term,* after the well was shut in, the failure to pay shut-in royalties resulted in a breach of the lease conditions entitling lessor to a forfeiture; and lessees cannot, just prior to the end of the primary term, breathe new life into the lease by paying shut-in royalties to maintain the lease beyond the primary term. The answer to that contention is, in part, contained in our foregoing reasons. It is that the payment of the delay rentals, during the primary term, under the circum-

stances of this case, did not result in a breach entitling lessor to a forfeiture. Rather, our holding is that the lease is in effect until the end of the primary term and, therefore, there is no valid reason for denying lessees the right to invoke the protection of the shut-in clause under circumstances and at a time it was designed to cover. Taylor v. Kimbell, 219 La. 731, 54 So.2d 1.

It is also urged that the payment of the shut-in royalties, just prior to the expiration of the primary term, is not a timely payment.

Under the literal terms of this lease, had lessees elected at the outset to avail themselves of the shut-in royalty clause to maintain the lease after the well was shut in, or had lessor insisted at the outset that the shut-in royalty payments be made, those shut-in royalty payments would properly have been made quarterly, that is, within three months of the shutting in of the well and within each quarter thereafter. Thus, the requirement of timely payment would present the question of whether payment was during the proper "quarterly" period computed from the anniversary date of the shutting in of the well. However, we find no occasion to consider the question of timely payment as applied to the shut-in

3. As pointed out heretofore, when the shut-in royalty clause is properly invoked, it should be considered that constructive production is taking place, which, under the terms of the lease, is capable of maintaining the lease in effect, even beyond the primary term.

clause during the primary term inasmuch as we have held that the parties have by their actions interpreted their contract differently; and lessees have been permitted to maintain the lease by the payment of delay rentals annually during the primary term. Therefore, during the primary term, the quarterly payment provision of the shut-in clause is not applicable. It becomes applicable, however, now that the shut-in clause is being invoked to maintain the lease beyond the primary term, and payment of shut-in royalties in advance of the expiration of the primary term to become effective with the expiration of the primary term, as was done here, is adequate compliance with that requirement. This is a reasonable result to reach. No other logical basis for these payments could be adopted, except to say, having consented to the modification of the contract in one respect, that change should not have the effect of rendering impossible of performance the other provisions of that same contract.

█ Lessor assigns as further grounds for forfeiture of the lease that, according to the language of the shut-in gas clause, only a well "producing gas only" can be shut in. It is contended that a strict reading of this clause would indicate that if the well produces condensate (as in this case), or other liquid, the clause would not be applicable. Cited in support of this position is the case of Vernon v. Union Oil Co. of California, 5 Cir., 270 F.2d 441, rehearing denied, 273 F.2d 178 (5th Cir.). Reference to that case discloses that the question was presented and the ruling was to the effect that the case was submitted to the jury in the Trial Court on an instruction which was an erroneous interpretation of the constructive production provision (shut-in gas clause). The case was, therefore, remanded —the Court noting that it was necessary for the jury to determine whether the well was capable of producing liquids in *paying quantities* as that determination could affect the application of the "producing gas only" provision of the shut-in clause.

The following comment by the Court in the Vernon Case is considered appropriate:

"On a purely verbal level, the three key words—'producing,' 'gas' and 'only' —are each subject to conflicting interpretations. Thus, the lessee contends that 'producing' means no more than bringing to the surface and that the process whereby the liquid condensate comes into being is a manufacturing process, and not a production process. The lessors, on the other hand, contend that 'producing' encompasses all steps necessary to prepare the gas for market.

"The conflict is even more accentuated with regard to the proper interpretation of the word 'gas.' In keeping with its aforementioned interpretation of 'producing,' the lessee contends that 'gas' comprehends all substances

which exist in a gaseous state in the reservoir. Alternatively, it contends that 'gas' comprehends all substances in a gaseous state upon arrival at the surface. The application of either test, it contends, places liquid condensate squarely within the definition of 'gas.' The lessors, on the other hand, urge that 'gas' means no more than that substance which, under normal production operations, is marketed and sold in a gaseous state. Thus, under the lessors' views, liquid condensate is not gas.

"Finally, the lessee contends that the word 'only' is designed merely to exclude wells productive of oil from the constructive production provision, whereas the lessors contend that 'only' is designed to limit the provision to wells from which only gas is marketed.

"Considered alone, this conflict would be difficult, if not impossible, to rationally resolve. Each interpretation suggested is possible and each has been supported by presentation of a formidable array of authorities. Fortunately, however, we find it unnecessary to approach the problem in such a semantical fashion. Rather, we must look to the purpose of the constructive production provision and adopt the construction most consonant with that purpose.

"This purpose was quite accurately stated by the learned trial judge in his oral opinion granting the lessee's motion for judgment notwithstanding the verdict:

"'* * * The origin of such a lease provision does not seem to be shrouded in any doubt. The reason that this kind of a provision has come into growing use during the last twenty-five years goes back to the inherent physical nature of natural gas. Unlike oil, it cannot be produced and stored or transported in railroad cars or tank trucks. A lessee completing a gas well consequently often had a special and quite onerous problem in finding a market outlet for his gas production. This would, at times, result in losing a lease at the end of the primary term and the dissipation of all prospect for profit from the lessee's development investment. Of course, the self-interest of lessees was behind the introduction of this particular provision, but they had a fair case for some reasonable measure of protection.'

"When the words 'producing gas only' are considered against the background of this purpose, much of their apparent ambiguity disappears. The distinguishing attributes of gas which gave rise to the provision are the difficulties of storage and transportation. These attributes became important only because they were possessed by gas after it had been brought to the sur-

face and prepared for market. Reservoir conditions were important only insofar as they affected the state of the final product. Liquid condensate, not being possessed of these attributes *at the critical point,* i. e., when prepared for market, is not therefore 'gas' within the intendment of the constructive production provision.

"It does not, however, necessarily follow that the well here in question is not a well 'producing gas only.' It is well known in the gas industry, as shown in this record, that nearly all gas wells produce some liquid condensate. A holding that the constructive production provision applies only to wells producing no liquid condensate would render that provision almost nugatory. We do not view the provision as intended to be limited to such narrow scope. Its purpose, as set out above, is to protect the lessee against loss of his lease when production from a well is impossible because of the absence of a readily accessible market for gas, and the further absence of any reasonable and legally permissible use for the gas. Where a well is capable of producing only negligible quantities of liquid condensate, the need for such protection persists. In such a case, the constructive production provision would be applicable. But where the well is capable of producing liquid con-

densate in paying quantities, i. e., where it would be reasonable to operate the well to produce liquid condensate alone, the need for protection ceases as does the application of the constructive production provision." See, also, Summers Oil and Gas, Sec. 299.

The Commissioner of the Department of Conservation has classified the instant well as a gas well. The Legislature, in another context, has defined "Oil" and "Gas" as follows:

"(4) 'Oil' means crude petroleum oil, and other hydrocarbons, regardless of gravity, which are produced at the well head in liquid form by ordinary production methods.

"(5) 'Gas' means all natural gas, including casinghead gas, and all other hydrocarbons not defined as oil in paragraph (4) above." LSA–R.S. 30:3.

Lessor is challenging the foregoing classification and definitions by asserting that the well here is not a well "producing gas only" relying upon the fact that condensate was sold from this well. The record, however, though inferentially disclosing that condensate is a liquid, does not reveal that it was produced at the wellhead or whether it results from a process after production. Accepting the fact that the well was capable of producing condensate, we think it necessary to determine whether the well was capable of producing condensate in

paying quantities before we can deny the application of the shut-in well clause for the same reasons assigned in the Vernon Case, supra.

The evidence of the products other than gas produced when the well was connected to a pipeline on May 13, 1958, could be a criterion to establish whether it was capable of producing products other than gas in paying quantities. But this fact without others is not enough. There is no evidence of the costs of production which necessarily affects a determination of whether the production is in paying quantities, no evidence that the same allowable would have been valid before the formation of the unit, no evidence of the costs of a recycling well to prevent the wastage of gas which would have resulted from the production of condensate only, no evidence of regulations applicable to the production of condensate only—in short, there is no evidence to permit a decision on this point.

Since the burden of proof is upon the party attacking the lease to show that the well was capable of producing products other than gas in paying quantities, the absence of evidence to support such an attack compels a rejection of the claim for forfeiture on this basis.

All circumstances would not justify acceptance of the classification given to a well by the Commissioner for purposes not clearly related to the reasons for the classification. Nor would that classification fail to yield to persuasive facts establishing its incorrectness. Clymore Production Co. v. Thompson, D.C., 13 F.Supp. 469.

The Commissioner's objective in classifying the well in the instant case was for those purposes associated with regulations he is authorized to impose, such as assigning allowables and determining unit sizes. This classification does not clearly apply to the problem presented by lessor's contention here and would yield to persuasive facts establishing that the well is not a gas well. But lessors, who have urged this issue, have brought no evidence to contradict the Commissioner's classification. We will, therefore, accept that classification. Thus, we hold that the well is such a well as was contemplated by the shut-in gas clause of the lease; that the shut-in payment has maintained the vitality of the lease and the suit for forfeiture is denied.

Accordingly, the judgment of the Court of Appeal is reversed and the judgment of the Eleventh Judicial District Court, De-Soto Parish, Louisiana, is approved. Plaintiff to pay all costs.

HAWTHORNE, J., concurs in the decree.