208 So.2d 715 (1968)
PAMPER CORPORATION, Plaintiff-Appellant,
v.
TOWN OF MARKSVILLE, Defendant-Appellee.
No. 2212.
Court of Appeal of Louisiana, Third Circuit.
March 27, 1968.
Rehearing Denied April 22, 1968.
Writ Refused June 7, 1968.
*716 Thompson, Thompson & Sparks, by James D. Sparks and Robert Cudd, III, Monroe, for plaintiff-appellant.
*717 Edwin L. Lafargue, Charles A. Riddle, Jr., Marksville, for defendant-appellee.
Before FRUGE, SAVOY, and LEAR, JJ.
FRUGE, Judge.
Plaintiff, Pamper Corporation, is suing the defendant, Town of Marksville, for sums allegedly owed plaintiff as a result of extra work performed pursuant to a construction contract under which plaintiff paved and improved a number of streets in the Town of Marksville. Plaintiff sought recovery of $33,303.89, but the trial court rendered judgment in its favor for only $20,050.22, which sum represented the amount of retainage which defendant admittedly owed plaintiff. Having been denied recovery on all its contested claims, plaintiff effected this devolutive appeal.
Plaintiff-appellant's claims fall under three general headings:
I. Claims for extra work performed not included in the original contract.
II. The propriety of defendant's assessing $2,520.00 held as liquidated damages.
III. The date from which interest on the amount of $20,050.22 awarded by the trial court should accrue.

I
First, we shall consider plaintiff's claim for expenses incurred over and above that contemplated in the construction contract. Plaintiff, of course, seeks to prove those expenses through evidence extrinsic to the contract itself.
The general rule relative to such proof is that the written contract speaks for itself and all parties thereto are bound by its provisions. Therefore, the contractor usually cannot collect for any "extra costs" incurred it in performing under the contract. See C.C. Arts. 1901, 1945, 2276. Meaux v. Southern Construction Corp., 159 So.2d 156 (La.App. 3d Cir., 1963).
This rule is not absolute, however, and there are some instances where a contractor may be permitted to recover for expenses incurred by him which were not included in the contract. See Civil Code Arts. 2763, 2764; Roff v. Southern Construction Corp., 163 So.2d 112 (La.App. 3d Cir., 1964); Groner v. Cavender, 16 La. App. 565, 133 So. 825 (La.App. 2d Cir., 1931).
Even where the contract had a provision to the effect that the owner shall not be liable for any extra work unless the owner has given written authorization for that work, the consistent actions of the two parties may be found to constitute a "waiver" of this provision, and recovery can be allowed the contractor, notwithstanding that no written authorization was given by the owner to perform such additional work. See Roff v. Southern Construction Corp., supra, and cases discussed therein; Groner v. Cavender, supra.
A. Plaintiff's first item of extra work for which it claims remuneration is its replacing some old culverts with new culverts, where the contract contained no provision therefor. The pertinent contractual provision states:
"All driveway and walkway culverts and bridges shall be removed with care, and immediately replaced * * * [by plaintiff] if in the opinion of the Resident Engineer, such pipe or bridges are of adequate size and suitable condition for reuse."
Plaintiff contends that it replaced culverts which were not suitable for reuse with new ones under the direction of the resident engineer, in spite of the fact that under the above-quoted provision, it was not required to do so. Therefore, plaintiff seeks recovery for the cost to it for replacing those culverts it claimed to be not *718 of "adequate size and suitable condition for reuse".
We agree with the trial court in holding that this claim must be rejected for various reasons. First, the determination of which of the culverts were of adequate size and suitable for reuse is a determination left entirely up to the judgment of the resident engineer under the terms of the contract. The contract is silent as to what is to be done in regard to old culverts not suitable for reuse. The record does not indicate what culverts or how many were not of sufficient size and suitable condition for reuse. Plaintiff's claim, therefore, is based upon the opinion of its engineer, Mr. Poulas, and not the findings of the resident engineer, as required in the contract.
Second, the record reveals the president of the corporation had agreed with the Mayor of the Town of Marksville that (according to the mayor's testimony) it would be permissible under the terms of the contract to allow replacement of some of the old culverts with new culverts, which the plaintiff would install without any charge whatsoever to the defendant, because such would involve no substantial added expense to plaintiff. Thus, the installation of new culverts in the place of old culverts removed was apparently thought by the parties to be consistent with the terms of the contract.
Finally, contrary to the provisions of the contract, the plaintiff submitted no claim for this extra work until after all the work was completed and the construction project was approved by defendant.[1]
In the alternative, plaintiff also seeks recovery of this item in quantum meruit. But the record fails to support the application of this principle, especially since we have already concluded that plaintiff failed to prove that this item constituted "extra work" over and above that called for by the contract.
This item, therefore, was properly rejected.
B. Plaintiff's next item emanates from its being required to use machinery allegedly different from that contemplated by the contract.
Under the contract it was plaintiff's duty to shape the roadways upon which it was working. In regard to the manner in which this was to be done, the specifications provide:

"Ditches shall be pulled, fore slopes and shoulders shaped and the various sections of the roadway, after shaping, shall be not less than the minimum requirements as shown on the Plans, unless otherwise directed by the Engineers.
"Existing side drains to private drives and alleys shall be removed to permit pulling the ditches and shaping the roadway and shall be immediately replaced following the completion of these operations. No payment will be allowed for this work, but the cost therefor shall be included in the prices bid on the various pay items." (Emphasis ours.)
Plaintiff's expert, Mr. Poulas, testified that the above-emphasized language contemplates the use of a "motor patrol" in the ditches and not the use of a "gradeall". He stated that the motor patrol could do the job much more quickly than a gradeall if the drains and the driveways were removed beforehand. Mr. Poulas further testified that the resident engineer issued a written instruction to plaintiff requiring that it perform this work with a gradeall. As a result, plaintiff had to rent a gradeall, at its expense, and the portion of the contract involving its usethat is, the shaping of the roadways sectiontook plaintiff about *719 twice the time it otherwise would have taken had it been able to use a motor patrol.
Defendant's witnesses testified differently in regard to this matter. Their testimony was that because of the wet weather and general muddy condition of the road, and also because of the narrow rights of way the Town owned adjacent to each of the streets in question, a motor patrol could not be gotten into many of the places where its work was to be performed, and in places where it was used, it did not do an adequate job. Because of this, plaintiff was advised that better results would be obtained through the use of a gradeall. Defendant's witnesses stated that plaintiff's supervisors agreed that a gradeall was needed to perform the work properly. Even one of plaintiff's experts testified that he would use the gradeall along with the motor patrol in order to adequately shape the roadways as contemplated by the contract.
Although the contract provision quoted above may have "impliedly" contemplated the use of a motor patrol in the road-shaping phase of the construction, there is nothing in the contract which prevents the use of a gradeall in that phase of the work. The contract specifically provides that the shaping of the roadway be done to certain specifications and to the approval of the resident engineer. Thus, it would seem that plaintiff could use any equipment it desired so long as the final project met the approval of the resident engineer. In plaintiff's bid as to this portion of the contract, it should have considered the conditions under which it would be working that is, that in the latter part of the year there was a likelihood of muddy conditions prevailing and also that it must perform this work within the limited rights of way owned by the Town.
We do not feel as though the use of a gradeall for the shaping of the roadways was anywise extra work not contemplated under the contract. Furthermore, we do not feel that quantum meruit can apply here, for the defendant has received no special benefit from plaintiff's using a gradeall instead of a motor patrol. The end result of the work performed by the gradeall was the same as that which would have been achieved by the motor patrol under better conditions, and that result is what plaintiff obligated itself to achieve under the contract.
C. Plaintiff requests payment for 71.5 tons of Bituminous Hot Mix, which it claims was applied to the streets under the terms of the contract. Defendant denies liability for this mix because this disputed amount was not on the suppliers worksheet; nor were the tickets for this mix produced when the total amount of hot mix used was computed and checked by the supplier, the defendant, and the plaintiff, collectively.
The plaintiff's position is simply that the tickets showing the delivery of 71.5 tons of hot mix were inadvertently not included when this portion of the work was checked and approved by the testing laboratory. All hot mix which was supplied was supposedly registered by the supplier on a master sheet (called a work-sheet). We find no explanation of why this 71.5 tons of mix was apparently not included on the master sheet, and why no tickets were produced showing this tonnage until after a final check and approval of the total hot mix supplied by the testing laboratory.[2]
Relative to this point, the trial court suggested the possibility of fraud, which we do not discount. The system employed at the time of handling these tickets and approving of them left much to be desired, as evidenced by a serious dispute at one point in regard to the actual quantities of hot mix which were placed on the streets.
*720 Although the initials on many of the slips evidencing the delivery of 71.5 tons of hot mix were identified by an employee of plaintiff's company, we share the trial court's suspicion as to the validity of this claim in view of all the mysterious circumstances surrounding it. Thus, we are unable to say that the trial court was manifestly erroneous in refusing to award plaintiff compensation for these 71.5 tons of Bituminous Hot Mix.
D. Plaintiff's final claim for extra work performed was its cost of extra labor and rentals on stand-by equipment for nine days, during which time there was a dispute as to the quantities of hot mix which had been delivered (which dispute was ultimately settled in favor of plaintiff through arbitration). Plaintiff claims that upon the occurrence of the dispute the subcontractor stopped supplying it with hot mix, which action suspended the work under this portion of the contract until the dispute was resolved nine days later. Despite the fact that no progress was made during that time, plaintiff claims that it had to continue paying workers to maintain the roadways in proper condition and had to pay rentals on stand-by equipment.
Defendant's evidence on this point was somewhat different. Its engineer's records showed the men employed during those nine days and the work that they were actually doing. These records did not indicate that any of the work crew was maintaining the roadways as a direct result of the dispute.
As to this item it is our opinion that the plaintiff simply has failed to prove this claim by preponderance of the evidence, and therefore, it is denied.
As we have said before, all the above items are claims for which no compensation was provided in the contract itself. The time and method which plaintiff now seeks to realize on these claims is contrary to the provisions of the construction contract; and for us to hold in his favor we would have to hold that these provisions of the contract requiring that plaintiff cannot collect for extra work unless such was ordered in writting by defendant were "waived" by the parties. Regardless of whether or not there was such a waiver, it is our opinion that plaintiff's claims are not sufficiently substantiated by the evidence, considered as a whole, to merit judgment in its favor.

II
The construction was to be completed within 180 calendar days from its commencement. This period ended on December 5, 1964. Work was not completed by plaintiff however, until January 2, 1965 a 28-day delay in the completion of the work. Because of the delay, the defendant enforced the provision in the contract providing for liquidated damages in the amount of $90.00 per day, thereby retaining the total sum of $2,520.00.
The plaintiff contends that the defendant cannot legally withhold this amount as liquidated damages because: (1) The 28day delay was not attributable to his own fault, and (2) Because he was not put in default before the defendant assessed liquidated damages.
The contract provides that the contractor is not to be held responsible for any delays which were unforeseeable and beyond his control and did not arise out of his own fault or negligence. The contract also provided, however, that whenever a delay is imminent the contractor shall, "within ten days of the beginning of such delay" notify defendant in writing of the cause of delay and request an extension of time, therefor.
(1) Plaintiff contends that the delay in completing the contract was without his fault and beyond his control because of three things: (a) Hurricane Hilda, which struck during the early part of October while work was under way, (b) As a result of the nine-day delay which was caused by the hot mix dispute, and (c) the delays which were necessitated by its having to *721 utilize a gradeall in the shaping of the roadways portion of the contract instead of a motor patrol, which it had thought it could use.
As to the first two of the above-mentioned delays, the plaintiff failed to notify the defendant in writing as required by the contract prior to the completion of the work and to request an extension of time as a result thereof. See Meaux v. Southern Construction Corp., 159 So.2d 156 (La.App. 3d Cir., 1963).
Plaintiff, however, contends that this provision should not be contrued strictly against him because of the loose manner in which the parties dealt in regard to other provisions of the contract. We do not feel that this argument can aid plaintiff, however. Although defendant may not have always given plaintiff written orders for changes in the work under the contract, as required in paragraph 17 of the general contract provisions, both parties' actions indicated they agreed to that procedure in regard to those changes and they become bound thereby. See Davis v. Laster, 242 La. 735, 138 So.2d 558, 96 A.L.R.2d 332 (1962). But that does not alter or render ineffective other provisions of the contract, such as the one here, which states that plaintiff must notify defendant of any delays within ten days of the commencement of the delay. There is nothing in the record to indicate that the parties agreed that this provision need not be strictly adhered to. Furthermore, we are convinced that the plaintiff should be given no credit for the first two alleged delays because the record does not sufficiently substantiate plaintiff's claims in those regards.
As to the last delay for having to use a gradeall in the place of a motor patrol, we do not feel that this item was an unforseeable delay beyond the control or without the fault or negligence of plaintiff. As a skilled contractor, plaintiff should have anticipated the possibility that a gradeall might be needed under the circumstances. Therefore, it is our opinion that this last delay was not one for which plaintiff should automatically be excused under the contract provision.
As such, the granting of this delay was a matter left to the discretion of defendant. By its actions, defendant refused to allow this delay, and we are unable to say this refusal was arbitrary or unjustified.
There is some evidence in the record indicating that Mayor of the Town and others had repeatedly requested plaintiff to speed up the work progress because plaintiff was running behind the scheduled time for the completion of various sections of the contract. The record also indicates that at least 5 percent of the work called for under the contract was deleted at the option of the defendant, and that other work which plaintiff alleged that he had completed was not performed. The work performed by the gradeall, for which plaintiff claims a delay was completed only three or four days after the completion date of the contract, and thus, constituted but a small part of the total 28-day delay.
Plaintiff sent defendant a letter requesting a delay as a result of its being required to use a gradeall in the roadshaping process; but this letter was sent to defendant on December 12, several days after the completion date of the contract. At that time, plaintiff was already in default for failing to have performed the contract during the time stipulated therein. We do not feel as though the letter dated December 12 was effective to prevent the accrual of liquidated damages, especially since the granting of the delay requested in that letter lay within the discretion of defendant.
Plaintiff's second contention that it was not put in default before liquidated damages were assessed against it has no merit whatsoever. The contract specifically provides that time was of the essence and, in addition, that the contractor would automatically be in default if he had not *722 completed all construction within the 180 days allowed under the contract.
Plaintiff's final argument against the assessment of liquidated damages is that defendant failed to withhold them in the manner prescribed by the contract. Specifically, plaintiff refers to the provision which requires that defendant "shall retain from time to time [liquidated damages] * * * from current periodical estimates". Plaintiff contends that under strict interpretation of the contract defendant cannot be allowed liquidated damages because such were not retained "from current periodical estimates," but instead, such damages were retained only from the last payment which defendant made to plaintiff.
We disagree with plaintiff's construction of the contract language. It is our opinion that the words "from time to time" indicate that defendant had discretion in retaining sums as liquidated damages from any of the current periodic payments whenever he has good reason to believe that plaintiff was substantially behind in its work progress. We feel that this provision only means that the defendant must retain the sums as liquidated damages from the thencurrent periodic estimates submitted by plaintiff, and not from other sources.
Thus, defendant retained liquidated damages in accordance with the contract provision, and therefore, we find no error of the trial court in permitting defendant to assess the sum of $2,252.00 as liquidated damages for the 28-day delay in the completion of the contract.

III
Plaintiff's last claim is for legal interest on the sum of $20,050.22, which defendant concedes is owing to plaintiff. Plaintiff's position is that as of the date of the final acceptance of the work performed the above amount became owing and interest began to accrue by virtue of Article 1938 of the Louisiana Civil Code.[3] Therefore defendant became obligated under that article to pay plaintiff legal interest from the date of final acceptance of the work performed by plaintiffthat is, on April 1, 1965.
We agree with plaintiff in its position that the above sum became due upon the final acceptance of the work performed. But there was a condition attached to this final payment under the written contract which, in our opinion, renders Article 1938 inapplicable. Primarily because one-half of the cost of this construction was to be paid by the Federal Government, defendant was unauthorized to make final payment to plaintiff unless plaintiff released defendant of all claims arising out of the construction of the contract involved here. Likewise, under the provision of the contract itself, plaintiff's acceptance of the final payment by defendant would constitute a release and would bar its future recovery for any claims it might at that time have against defendant.
Consequently, the defendant was unauthorized to make the final payment to plaintiff until plaintiff complied with the contract provision in agreeing to release defendant of all of its claims; and, at the same time, plaintiff would not accept final payment without reserving its claims against defendant. Defendant tendered final payment in the sum of $20,050.22, subject to the conditions as prescribed under the contract, and plaintiff, of course, refused to accept that payment under those conditions because it intended to judicially seek remnueration for its additional claims.
Under these circumstances, we cannot say that plaintiff was entitled to interest during that interim when it refused to accept the final payment tendered by defendant. Since plaintiff's claims for additional compensation had to await a *723 judicial determination, the conditions attached to its acceptance of the final payment were not satisfied until the judgment of the lower court was rendered; and, therefore, plaintiff is entitled to interest only from that date.
For the foregoing reasons, the judgment of the trial court is affirmed at plaintiff-appellant's costs.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
SAVOY, J., is of the opinion that a rehearing should be granted limited to liquidated damages.
NOTES
[1] Section 22 of the contract provides:

"No claim for extra work or cost shall be allowed unless the same was done in pursuance of a written order of the Architect/Engineer approved by the owner, as aforesaid, and the claim presented with the first estimate after the changed or extra work is done."
[2] Paragraph 42.11(A) of the contract states:

"The quantities [of Bituminous Mixtures] for payment shall be the weights of accepted mixture actually incorporated in the completed work as shown on reports of the Testing Laboratory."
[3] Article 1938 states:

"All debts shall bear interest at the rate of five percentum per annum from the time they become due, unless otherwise stipulated."