**Joanna Wurtele LOWMAN, J. Philip Hunter, Bruce H. Hardy, In their capacity as trustees for Edward Marshall Lowman, Allan Wurtele Lowman and Elizabeth Lowman, Plaintiffs-Appellants,**

v.

**CHEVRON U.S.A., INC., Defendant-Appellee.**

No. 83–3754.

United States Court of Appeals, Fifth Circuit.

Dec. 14, 1984.

Hargrove, Guyton, Ramey & Barlow, Thomas J. Wyatt, Shreveport, La., for plaintiffs-appellants.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, John C. Christian, New Orleans, La., for defendant-appellee.

---

Before GEE, POLITZ and HIGGIN-BOTHAM, Circuit Judges.

GEE, Circuit Judge:

Joanna W. Lowman and the trustees for her three children (collectively "Lowman") brought suit against Chevron U.S.A., Inc. (Chevron) in Louisiana state court seeking cancellation of portions of an oil, gas, and mineral lease included in three production units established by the Louisiana Commission of Conservation. Chevron removed the case to the United States District Court for the Middle District of Louisiana under 28 U.S.C. § 1441(a). After a bench trial the district court entered judgment for Chevron. We affirm.

I.

The essential facts in this case are undisputed. Lowman owns an undivided interest in a tract of land of about 4314 acres in Pointe Coupee Parish, Louisiana. Chevron holds an oil, gas, and mineral lease on this land. Portions of the tract are included in six different drilling or production units established by Louisiana's Commissioner of Conservation. Lowman sued for cancellation of a portion of the lease included in three units established by the Commissioner because of late payment of "shut-in" rental due under the lease. These three units are known as the Albritton, Deville No. 1, and Harlaux wells.

The lease between Lowman and Chevron contains a "Pugh clause," which provides that production from a unit well maintains the lease in effect only as to that portion of the land actually included within the unit.[1] To maintain portions of leased tract not included in a unit, the lease requires Chevron to pay delay rentals. The lease provides that the lease will terminate one year from the date of its execution and on that day each year thereafter unless Chevron is drilling, producing, or paying delay rentals. In 1979 and 1980, Chevron paid Pugh clause rentals for the portions of the leased tract not in production.

The lease also provides that as a well is completed, Chevron must begin to pay "shut-in" rentals within 90 days after production ceases to maintain its rights under the lease.[2] In accordance with this provi-

---

1. Paragraph 14 of the lease, which contains the Pugh clause, provides in pertinent part:

Anything to the contrary elsewhere in this lease notwithstanding, it is understood and agreed that drilling, mining or re-working operations upon, or production of any mineral from any unit established by a Lessee pursuant to Paragraph 2 hereof shall not serve to maintain this lease as to the non-unitized portion, i.e. that portion of the leased lands not included in any such unit, but only as to the unitized portion, i.e. that portion of the leased lands included in such unit. If any such unit is established, then this lease may be maintained (a) as to the non-unitized portion and (b) separately as to each unitized portion in any manner elsewhere provided in this lease. If Lessee shall elect to maintain this lease by payment of rental, such payment shall be calculated at the rate per-acre provided in or determinable from Paragraph 1 or Paragraph 1(a) hereof and shall be paid (a) on the number of acres of the leased lands in the non-unitized portion and held by a Lessee hereunder, or (b) on the number of acres of the leases [sic] lands in any unitized portion as to which payment is made or (c) both, if Lessee shall so elect; but such rental payment shall maintain this lease in effect only as to that portion of the leased premises not maintained

in some other manner provided for in this lease....

2. Paragraph 6 of the lease, dealing with shut-in rentals, provides in pertinent part:

After the production of oil, gas or any other mineral in paying quantities, either on the leased premises or, on lands pooled therewith (or with any part thereof), the rights granted shall be maintained in effect during and after the primary term and without the payment of the rentals hereinabove provided for so long as oil, gas or some other mineral is being produced in paying quantities. It is provided, however, that if, after the production of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause, and Lessee is not then engaged in drilling or re-working operations, this lease shall terminate unless the Lessee resumes or restores such production, or commences additional drilling, re-working or mining operations within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of re-working operations or operations for the drilling of another, in an effort to restore production of oil, gas or other minerals.

sion, Chevron prepared a check for shut-in rental in January 1981 and mailed it to Lowman. Although the check was prepared on January 16, 1981, the check bore the date "07 16 81," a date more than 90 days after the discontinuance of operations on each of the three wells relevant in this case.[3] On March 23, 1981, a date more than 90 days following discontinuance of operations on the last well completed, Lowman's attorney notified a representative of Chevron that the shut-in rentals check was dated July 16, 1981, and that therefore the lease had terminated as to the portions of the leased tract included in the Albritton, Deville No. 1, and Harlaux units. Chevron prepared a replacement check dated April 2, 1981, which it mailed on April 3. Lowman rejected the amount tendered and returned both checks to Chevron. This litigation followed.

## II.

Lowman contends that Chevron's failure to make timely shut-in rental payments cancelled the lease as to the three wells in question. Chevron argues that the lease required it to make Pugh clause and shut-in payments only as to units Chevron itself established. Because the units in question were established by the Louisiana Commissioner of Conservation, Chevron contends it had no obligation to make rental payments, but made such payments out of an "abundance of caution." Lowman argues that Chevron's payment of Pugh clause rental in 1979 and 1980 indicates that Chevron believed that the lease required it to make the rental payments, and because Lowman accepted the Pugh clause payments, the courts should accept the parties' construction of an ambiguous term in the lease.

▆▆▆▆ The district court's holding in favor of Chevron on this point is correct. Under the Louisiana Mineral Code, opera-

tions on the leased land sufficient to maintain the lease according to its terms will continue the lease's effectiveness in its entirety. La.Rev.Stat. 31:114. The parties may modify the effect of 31:114 by contract, however, and paragraph 14 of the lease provides that if Chevron establishes any voluntary drilling units, Chevron must pay Pugh clause rent to maintain its interest in the nonunitized property. In this case, however, Chevron did not establish the units on the leased tract; the units were established by the Louisiana Commissioner of Conservation. The few cases that have considered this issue have concluded that drilling units established by the Commissioner of Conservation are not "voluntary" actions of the lessee and therefore do not trigger the operation of a Pugh clause. *Odom v. Union Producing Co.*, 129 So.2d 530 (La.App.1961), *rev'd on other grounds*, 243 La. 48, 141 So.2d 649 (1962); *Bennett v. Sinclair Oil & Gas Co.*, 275 F.Supp. 886 (W.D.La.1967), *aff'd* 405 F.2d 1005 (5th Cir. 1968); *Smith v. Carter Oil Co.*, 104 F.Supp. 463 (W.D.La.1952). Therefore, the district court correctly concluded that no Pugh clause or shut-in rental payments were due under the lease.

## III.

Lowman also contends that Chevron's payment of Pugh clause rent in 1979 and 1980, combined with her acceptance of the payments, effectively modifies the terms of the lease. Lowman argues that the lease term regarding Pugh clause rent is ambiguous, and that the parties, by their conduct, have indicated their understanding of the ambiguous term. Therefore, Lowman contends, even if Louisiana law did not require Chevron to make the rental payments, the lease agreement, as modified, did so require.

---

In the event that any well on the land or on property pooled therewith (or with any part thereof), is capable of producing gas or gaseous substances in paying quantities but such minerals are not being produced, then Lessee's rights may be maintained, in the absence of production or drilling operations, by com-

mencing or resuming rental payments as hereinabove provided for in connection with the abandonment of wells drilled. . . .

**3.** The district court found the dating of the check to be the result of a typographical error.

We disagree. Lowman cites *Davis v. Laster,* 242 La. 735, 138 So.2d 558 (1962), as authority for her contention. In *Davis,* the court held that a lessor who had for nine years accepted delay rentals instead of the shut-in rentals that the lease required could not cancel the lease because of the lessee's failure to pay the proper rent.[4] This holding does not apply to the facts of the instant case. First, in *Davis* the lease term in question was truly ambiguous, and the court held that the parties had conclusively established the term's meaning through their course of performance over nine years. In this case, the lease terms involved are unambiguous, and clearly indicate that Chevron had no obligation to make Pugh clause or shut-in rental payments. Chevron, however, chose to make the payments to protect itself from claims that it had not fulfilled its obligations under the lease. Chevron believed that making these relatively small payments[5] was preferable to the risks of litigation.

Second, although Lowman asserts a claim essentially based on principles of estoppel, she has not shown that she relied to her detriment on Chevron's actions in performing its obligations under the lease. Indeed, Lowman has benefitted from Chevron's "abundance of caution" by receiving $16,000 more than she was entitled to receive under the lease, and she has acquired no corresponding burden. Like the court in *Smith v. Carter Oil Co.,* 104 F.Supp. 463, 472 (W.D.La.1952), we conclude that Lowman ought not be heard to complain of receiving payments not due under the lease or to disadvantage the lessee because it paid more than it need have. The judgment of the district court is therefore

AFFIRMED.

---

**4.** The *Davis* decision was based on article 1956 of the Louisiana Civil Code, which reads: "When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation." *Davis* involved an oil and gas lease with a primary term of ten years. In the first year of the lease, the lessee drilled and completed a gas well, but shut the well in because no pipeline facilities were then available at the well site. For nine years thereafter, the lessee paid the lessor delay rentals, which were significantly higher than the shut-in rental would have been. When the lessee tendered the shut-in rental for the tenth year, the lessor refused to accept it and filed suit to cancel the lease. The court held that the lease provisions regarding payment of shut-in royalty were ambiguous and concluded that the lessee's payment of delay rentals during the primary term of the lease did not preclude the lessee from maintaining the lease beyond the primary term by paying the shut-in royalty before the end of the term.

**5.** At oral argument counsel for Chevron indicated that the rentals paid to Lowman totaled about $16,000. By contrast, a well similar to the ones involved in this case can cost Chevron as much as $15,000,000 to drill and bring into production.