62 So.2d 615

**SOHIO PETROLEUM CO. v.
V. S. & P. R. R. et al.**

**No. 40441.**

Nov. 10, 1952.

Rehearing Denied Jan. 12, 1953.

Shotwell & Brown and James H. Trousdale, Jr., Monroe, for plaintiffs-appellants.

Hussey & Smith, Shreveport, for plaintiff-appellee.

Sholars, Gunby & Guthrie, Monroe, for defendants-appellees.

FOURNET, Chief Justice.

The plaintiffs, owners of certain lots or mineral interests in lots lying within the city limits of Delhi, Louisiana, situated in the NE/4 of the SE/4 of Section 13, T. 17 N., R. 9 E., Richland Parish, instituted suits (27 in all) against George R. Mitchell and Carl B. Anderson, in whose favor they had executed oil and gas leases, and against their assignee, the Kingwood Oil Company, seeking the cancellation of the leases and for an accounting of the oil produced thereunder. They are now appealing from a judgment dismissing their suits and ordering the distribution of certain funds realized from this oil, placed in the registry of the court by the Sohio Petroleum Company, the purchaser, in a concursus proceeding provoked by this company because of a dispute existing among the claimants as to the basis on which this fund should be distributed.

The leases in controversy were all acquired by Mitchell and Anderson, either personally or through assignment, during the early part of 1946, principally during the months of May and June, and were by them assigned to the Kingwood Oil Company (hereinafter referred to as Kingwood) on September 30, 1946. Only one was introduced in evidence, it having been agreed by counsel they were identical for for all intents and purposes. Each lease was for a cash consideration, the exhibit in the record disclosing the cash consideration to have been $200, and conditioned that a well be drilled on the property within one year from date on penalty of the lease's termination as to both parties unless, on or before the anniversary date, the payment of $1 be paid or tendered for the deferment of this obligation for an additional 12 months, a similar payment delaying drilling operations during any succeeding 12-month period. Article 4. Article 2 provides that the primary term is for 10 years, and "as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder." Article 3(c) provides that "Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50.00 per well, per year, payable quarterly, and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract." Article 5 provides: "If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter or (if it be within the primary term) * * * commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production." This same article gives the lessee the right "in order to form a drilling unit or units to conform to regular or special spacing rules issued by the Commissioner of Conservation of the State of Louisiana, or by any other state or federal authority having control of such matters, or in order to conform to conditions imposed upon the issuance of drilling permits * * * at its option * * * to pool or combine the lands covered by this lease, or any portion or part thereof, with other land, lease or leases in the immediate vicinity thereof * * *."

Shortly after the discovery of the Delhi Field, the Department of Conservation, on May 31, 1945, following a public hearing, issued its basic Order No. 96, providing special rules and regulations governing the production of oil and gas from the Holt Zone and the May Sand in the Delhi Field, among these being the establishment of drilling and proration units of approxi-

mately 40 acres, following the regular outlines of governmental one-sixteenth sections. The owners of the tracts of land, leases, and mineral interests within these units were, either voluntarily or compulsorily, to pool their interests for the drilling of the only well permitted on each tract, to be located not more than 200 feet from the center thereof. This order further provided for the allocation of the production in the proportion that the area of each tract bore to the composite whole, for an allowable to be fixed on the basis of the known productive area of each sand, for tests for oil and gas ratios and bottom hole pressures, etc.

' On August 19, 1946, the Department of Conservation granted Kingwood a permit to drill an oil well in the approximate center of the NE/4 of the SE/4 of Section 13 (within which sixteenth section the property in these suits lies). This was brought in shortly thereafter as a gas well, capable of producing 3,970,000 cubic feet of gas daily through a ⅜th chock, and having a tubing pressure of 1,200 pounds per square inch. The gas-oil ratio was left blank, denoting there was not sufficient fluid or distillate in the well to be gauged at the time the test was made by the Department of Conservation on October 11, 1946. This well, designated the Kingwood-Jones No. 1, was capped immediately.

· Subsequently Kingwood began the drilling of the Kingwood-Jones No. 2 well, pursuant to Order No. 96–A–7 of the Commissioner of Conservation issued on August 8, 1947, as an exception to Order No. 96, after a full hearing during which the Commissioner found from the facts adduced the No. 1 well was not commercially productive of oil from any of the sands under special order in the Delhi Field, but that a portion of the tract appeared to be potentially productive of oil from the Holt Zone and the location of the new well appeared to be in the center of this productive acreage. This well was brought in in September of 1947 producing oil in commercial quantities and its production, including the royalty of the land and mineral owners, was sold to the Sohio Petroleum Company, being taken into the pipe line of this company attached to the well.

On May 25, 1950, Mrs. Ina Mae McEacharn, individually and as the natural tutrix of her minor children, instituted suit to cancel the lease executed by her on July 6, 1946, and for an accounting of the oil produced from the Kingwood-Jones No. 2 well, which had been drilled on her property, on the ground that the lease and its assignment to Kingwood had "terminated for non-payment of rent and/or royalty." On the same day George R. Sumlin instituted a suit to have his lease cancelled, contending it terminated because he never agreed to pool his property and no well had been drilled on his tract or rental paid in accordance with the lease provisions. In the alternative, he alleged that if the court found his property had been pooled

with other property on which an oil well was drilled, then, inasmuch as his property is situated within the acreage designated by the Department of Conservation in its Order No. 96–A–7, authorizing the issuance of the permit for the drilling of the Kingwood-Jones No. 2 well, his lease terminated anyway because of the nonpayment of his pro rata share of the rent and/or royalty.

On June 14, 1950, the Sohio Petroleum Company (hereinafter referred to as Sohio) filed a concursus proceeding depositing in the registry of the court a sum alleged to be due for the production from the Kingwood-Jones No. 2 well, the basis for the distribution of which it was unable to determine under the various orders issued by the Commissioner of Conservation, and over which a dispute existed among the claimants, some contending the fund should be distributed to the owners in the entire NE/4 of the SE/4 of Section 13, while others contended only the owners within the productive area found to exist in this sixteenth section, as outlined in the plat attached to Order No. 96–A–37 and containing 19.03 acres, were entitled to share it.

On July 17, 1950, Mrs. McEacharn and Sumlin amended and supplemented their original petitions, pleading, in the alternative, as an additional cause for the cancellation of their respective leases, that prior to the drilling of the Kingwood-Jones No. 2 well, Kingwood had drilled a gas well, the Kingwood-Jones No. 1, on the unit in controversy, that was shut-in on October 21, 1946, and on which the company had failed to pay the shut-in well royalty of $50 a year, as provided in Article 3 of their leases.

Long after the concursus was filed, numerous land and mineral owners in the area designated as productive for the drilling of the Kingwood-Jones No. 2 well, instituted additional suits for the cancellation of their leases, eleven on September 11, 1950, and fourteen on November 2, 1950, setting forth the same cause of action set forth by Sumlin in his original and amended petitions. All of these plaintiffs are represented by the same attorneys who instituted the Sumlin and McEacharn suits.

After a number of exceptions and preliminary pleadings filed by the defendants had been disposed of and they had moved for the consolidation of the concursus proceeding with the Sumlin and McEacharn cases, Kingwood, Mitchell, and Anderson, on September 25, 1950, answered, denying these plaintiffs had the right to terminate their leases and averring the several properties had been pooled pursuant to orders of the Commissioner permitting the drilling of only one well on the NE/4 of the SE/4 of Section 13, which well was drilled by Kingwood within the year, as the lease provided, and was brought in as a gas well capable of producing in paying quantities but that it was capped under government regulations; that they were thereafter pro-

hibited from drilling an additional well on the property until the Commissioner granted an exception to Order No. 96 on August 8, 1947, immediately following which the Kingwood-Jones No. 2 well was drilled, and it was, at the time of suit, still producing oil in paying quantities. They further averred that inasmuch as the lessors had failed to provide the tanks at the well for their share of the production, as stipulated in the lease contracts, it had been delivered into the lines of Sohio to their credit and an accounting thereof was being rendered in the concursus provoked by that company. The answers filed by these defendants in all of the other suits are to the same effect. Their answers to the concursus are, generally, affirmations of the allegations of Sohio.

The plaintiffs, answering the concursus on September 27, 1950, denied there was any controversy over the funds, the attempt to create one being merely an excuse for failure to pay rents and royalties. They averred the concursus was necessitated solely by the neglect of Kingwood "to do and perform normal, usual, and ordinary acts in its management and operations under" the leases, and prayed that Kingwood be taxed with the costs of the proceeding. They maintained, *alternatively,* that the leases held by Kingwood had terminated prior to the drilling of the oil well because of failure to pay (1) rentals, (2) shut-in well royalties, and (3) rent and/or royalty for a period exceeding two and a half years. Averring in a supplemental answer that these funds had been wrongfully withheld by Sohio during the period between the first purchase and the institution of the concursus, they sought interest at the rate of 6% per annum.

On the merits, the trial judge dismissed the suits for the cancellation of the leases. In the concursus he ordered the funds distributed among the owners of the entire 40-acre tract for the period prior to September 21, 1949, and among the owners in the 19.03 acre unit outlined on the plat attached to Order No. 96–A–37 from that date on. On rehearing he amended this judgment, ordering the distribution of the fund on the basis of the 19.03 acreage only. He did not allow interest and ordered the costs to be paid out of the fund on deposit. The plaintiffs alone have appealed. The question of whether those having interests outside the 19.03 acreage have any claim to this money is, therefore, no longer at issue.

The primary cause urged by all of the plaintiffs (with the exception of the McEacharns, on whose property the oil well was drilled) for the cancellation of their leases was that they terminated because of no drilling on their property within the year and the failure to pay rent for delaying this drilling; further, that their property was never unitized, either voluntarily or compulsorily, with any property on which there was drilling. This has been abandoned, as it must, for the ob-

vious reason that the leases of the plaintiffs, as shown above, specifically authorized the lessee, "in order to form a drilling unit or units to conform to regular or special spacing rules issued by the Commissioner of Conservation of the State of Louisiana * * * to pool or combine the lands covered by this lease, or any portion or part thereof, with other land, lease or leases in the immediate vicinity thereof * * *." And, under Article 2 of the leases it is stipulated that the primary term of the lease is to continue for so long after 10 years "as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder."

█ As pointed out by this court in the case of LeBlanc v. Danciger Oil & Refining Company, 218 La. 463, 49 So.2d 855, 857, "* * * all contracts of lease with respect to the development and production of minerals in this state must, of necessity, be subject to the police power exercised in protecting these natural resources, and that any provisions in our law with respect thereto form a part of these lease contracts the same as though written therein, a fact of which the parties to the original lease themselves took full cognizance when they included a provision in the lease subjecting it to state and federal laws regulating the production and operation on the land." Hence, when the Commissioner of Conservation, acting under the provisions of Act 157 of 1940, as amended, fixed the maximum area that might be efficiently and economically drained by one well in the Delhi Field as 40 acres, following the governmental sixteenth sections, the owners of such tracts to share ratably according to their ownership, such units, according to the provisions of Section 8(b) of Act No. 157 of 1940, LSA–R.S. 30:9, subd. B, constitute "a developed area as long as a well is located thereon which is capable of producing oil or gas in paying quantities."

█ Consequently, when the Kingwood-Jones No. 1 well was completed as a well capable of producing gas in paying quantities, within the year provided in the lease, the area forming this drilling unit was considered to be a developed area within the meaning and contemplation of the act, and Article 5 of the lease is inapplicable. In fact, another well could not have been drilled on this same unit without specific authorization, as secured in this case, i. e., by obtaining an order from the Commissioner of Conservation, following a full hearing and based upon his findings, warranting such exception to basic Order No. 96. It necessarily follows that the lease did not terminate for failure to pay rentals.

█ Article 3 of the lease, relied on by the plaintiffs as an alternative ground for the cancellation of their leases, does not provide for a forfeiture of the lease in the event of the failure of the lessee to pay the shut-in well fee or royalty of $50.00 a year. The payment of this royalty is not made a condition precedent for the continuation of the lease. Instead, the provision makes it optional with the lessee to

make such payment if he wants it "to be considered that gas is being produced within the meaning of Article 2" of the contract, i. e., the primary term is to be continued so long as minerals are produced.

Obviously counsel who represented all of the plaintiffs entertained the same view for, in filing the McEacharn and Sumlin suits, the first two filed, they based them (except for the non-unitization feature in the Sumlin suit) on the failure of the defendants to pay the royalty that had accrued from the production on the Kingwood-Jones No. 2 well. In the basic allegations of these petitions it is simply declared that the lease executed by the plaintiff was assigned by sub-lease to Kingwood on September 30, 1946, and, pursuant to an order of the Commissioner issued August · 8, 1947, this company drilled a well, the Kingwood-Jones No. 2, that has since been producing oil in paying quantities, and that although approximately 35,000 barrels of oil had been produced at the time of the institution of the suit, he had received no accounting therefor; consequently, the lease and its assignments "terminated for non-payment of rent and/or royalty," entitling the plaintiff to a judgment cancelling the lease and to an accounting of the oil produced. It was only after the concursus was provoked that the contention was urged, for the first time and as an additional cause for the cancellation, that the defendants had failed to pay the shut-in fee on the No. 1 well.

■ Plaintiffs' final argument, i. e., that the leases terminated for failure to pay the royalty due for over two and a half years, is equally without merit. Under the express terms of the contract plaintiffs were entitled to ⅛th of the oil or hydrocarbons produced, "to be delivered at the well in tanks provided by lessor, or to the credit of lessor into the pipe line to which wells may be connected." Hence, plaintiffs having failed to furnish tanks for their ⅛th, Kingwood literally complied with this provision by delivering the entire production into the pipelines of Sohio. Such compliance relieved this company of any further obligation with respect to this royalty.

Having reached this conclusion, we find it unnecessary to discuss the several authorities relied on by the plaintiffs, as they are neither apposite from a factual or legal standpoint.

■ We are in full accord with the finding of the trial judge that under the particular facts of this case it would have been difficult, and most unsafe, for Sohio to pay these royalties to anyone until the order of the Commissioner of September 21, 1949, became final upon the formal denial of a rehearing on December 21, 1949, and even then some of the property owners outside the 19.03 acreage were still claiming a share in this production, as evidenced by their appearance in the concursus proceeding.

We think the actions of the plaintiffs, as revealed by the record, disclose they shared the same view. Clearly their main purpose in executing the leases was to have *oil* produced from their acreage and to receive their just share of the royalties from such production. Yet they waited until after the last of these orders became final—a period of over two and a half years after the well was brought in—before bringing their suits.

Under these facts, we do not think the plaintiffs are entitled to the interest claimed, nor do we think we are authorized to tax the costs against Kingwood. See, Section 6 of Act No. 123 of 1922, as amended by Act No. 242 of 1944. LSA–R.S. 13:4816.

For the reasons assigned, the judgment appealed from is affirmed.

Rehearing denied; HAWTHORNE, J., dissenting from refusal to grant a rehearing.