FOURNET, Chief Justice
(dissenting).
I cannot subscribe to the majority view in this case, for it strikes down the structure in the mineral field this court has built slowly, carefully, and painstakingly over the years since “fugitive” minerals were first discovered in this state, and, because of the lack of any law affecting or classifying them, decreed the sale of minerals — or their reservation when the land is sold — was nothing more than the right or privilege of going upon the land for the purpose of exploring for them and reducing them to possession. This right or privilege was classified as being a real right in the nature of a servitude, and was to be governed by the articles of the Revised Civil *303 Code applicable thereto, one such providing that “A right to servitude is extinguished by the non-usage of the same during ten years.” Article 789. But this article is followed by another which declares that if the owner of such servitude “is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him [the owner] as long as this obstacle remains.” Article 792.
Consequently, the right of plaintiffs in this case to an undivided l/6th of all of the minerals under the 152-acre Mire tract, which they reserved when this tract was partitioned among the heirs of Veon and Euchariste Savoy Mire on November 27, 1946, was prescribed on November 27, 1956,[1] unless the accruing prescription was interrupted in the interim by the user of the servitude, or suspended.
Inasmuch as there was admittedly no production from any portion of the entire 152-acre tract during the 10 years ending November 27, 1956, that would have had the effect of interrupting the running of this prescription, the question presented for our decision here is whether this prescription was interrupted or suspended by the conservation commissioner’s Order 307, effective May 1, 1955 (1 year, 6 months, and 26 days prior to November 27, 1956), in which 320-acre spacing units for development of the Nodosaria “A” Sand in the Rayne Field were established, and by his Order 307-b, effective October 1, 1956 (1 month and 26 days prior to the end of the prescriptive period), under which the limits and permissible drilling area of some of these units were revised, constituted obstacles to the plaintiffs’ use of that portion of their servitude within the unit[2] under Article 792 of the Revised Civil Code; and, therefore, the development of the unit in 1957, taking into account the suspension period, was within the 10-year period.
The Court of Appeal for the Third Circuit recognized that “if the commissioner’s orders preventing drilling had the effect as obstacles to user of suspending prescrip *305 tion, all of the unitized 6I1/2 acres of the Mire tract within Unit 11 has been subject at one time or another to such a non-drilling order suspending prescription for from 6 to 17 months. Thus, the user of April 1957 was a user of the November 1946 servitude within the prescriptive period of ten years, taking into account the suspension of prescription through the non-drilling orders.” However, the court held that Boddie v. Drewett, 229 La. 1017, 87 So.2d 516, relied on by plaintiffs, was in-apposite, being distinguishable on the ground the entire 12-acre servitude involved in that case lay within the prohibited drilling area of the subject unit, and no well could, therefore, have been drilled thereon; whereas a well could have been located on a portion of the Mire tract within the “permissible drilling area”[3] of Unit 11 under Order 307[4] and Order 307-b,[5] as well as on the acreage in the Mire tract lying outside Unit 11.[6] It concluded, therefore, as had the trial j udge,[7] there was no obstacle to the accrual of prescription as to the entirety of plaintiffs’ servitude, and prescription was not suspended by virtue of the commissioner’s orders.
This holding is clearly not supported by the Louisiana constitution, the conservation statute, the applicable codal articles, the orders of the commissioner, or the ju *307 risprudence. We therefore granted plaintiffs’ application for a writ to review this decision, limiting it, however, to a review of the effect of the commissioner’s orders on the private property and contractual rights of plaintiffs.
In order that the problem thus posed may be better understood, I have reproduced here a plat of a portion of plaintiffs’ Exhibit No. 23, portraying the Mire tract as affected by the composition of the original and revised Unit 11.[8] For a proper un *309 ■derstanding of the approach to and the solution of this problem, I also deem it neces•sary to review and further analyze the conservation laws of this state from the viewpoint of their limited effect on private ■property rights.

*307

The Mire tract is the area lying within points 1, 2, 3, 4, 5, and 6.
*309 Plaintiffs acquired Lot 1 under the November 27, 1946, partition of this tract among the Mire co-heirs.
The shaded, portion of Block A constitutes the 3.05 acres of the Mire tract that lay within the purported “permissible drilling area” of Unit 11 under the commissioner’s order of May 1, 1955 — Order No. 307.
The shaded portion of Block B constitutes the 7.60 acres of the Mire tract within the “permissible drilling area” of Unit 11 under the commissioner’s order of October 1, 1956 — Order No. 307-b.
The only well that could be drilled on Unit 11 as revised in October 1956 is located on Block B, to the left of the portion of the Mire tract within this revised unit.
It has long been ‘established that the •state’s police power justifies measures for the regulation and production of oil and .gas, and for the conservation of these valu- ' able deposits (Ohio Oil Co. v. State of Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L. Ed. 729), but the beginning of legislative ■control in Louisiana was piecemeal, each ' law giving recognition to some additional aspect of the importance of the industry to the state. And it is, of course, unquestionable that the wasteful practices of early development brought recognition of the fact that it was in the public interest that maximum recovery of oil and gas be attained, as well as realization of the necessity for a sound public policy with reference to the conservation and production of these commodities. This caused the insertion in the Louisiana Constitution of 1921 of a new clause or section in which the Department of Conservation under the control and direction of a commissioner was created, and the legislature directed to enact laws “necessary to protect, conserve and replenish the natural resources of the State, and to prohibit and prevent the waste or any wasteful use thereof.” Section 1 of Article VI. However, all laws adopted pursuant to this constitutional mandate that affect private property rights must be considered in the light of other constitutional provisions protecting these rights, and it is only to the extent that it is necessary to protect, replenish, and conserve the natural resources, or to prevent any waste thereof, that the property rights of individuals must yield to the commissioner’s actions under this power. It is on this principle alone that *311 such laws and acts of the commissioner are constitutionally valid.
The legislature, in adopting its comprehensive statute in this field (Act 157 of 1940, now R.S. 30:2-30:20), and aware of the danger of having it declared unconstitutional if it unduly or unjustly impinged on valuable property rights in these resources, or unreasonably restricted the contractual rights of the owners with respect thereto, was careful in fixing the powers and duties of the commissioner to so limit them as to not deprive the owners of their private and contractual rights. Consequently, the power and authority vested in the commissioner under this law is not limited to the conservation of these natural resources and the prevention of their waste. The commissioner is also compelled to protect the rights of all owners that are affected by his actions under the statute. Any order of the commissioner that unnecessarily deprives any owner of his private property rights for- a purpose other than the conservation of the natural resources is, therefore, in violation of the Fifth Amendment to the Constitution of the United States and Section 2 of Article I of the Constitution of Louisiana, which clearly provide that private property shall not be taken for public use or purposes unless just and adequate compensation is paid, and, further, in violation of Section 10 of Article I of the Constitution of the United States which prohibits the states from passing any law that impairs the obligation of contracts, and of Section 15 of Article IV of the Constitution of Louisiana, which provides that no law shall be passed “impairing the obligation of contracts” and that "vested rights” cannot be divested, “unless for purposes of public utility, and for just and adequate compensation previously paid.” (The emphasis has been supplied.)
To insure that such constitutional rights are not violated, and that the commissioner’s actions do not have the effect of depriving individuals of their property and contractual rights in derogation thereof, the legislature spcc'iically provided that the commissioner, once he has determined after due notice and hearing it is necessary to conserve our mineral resources and prevent their waste, is to “establish a drilling unit or units for each pool.” Such a unit is “the maximum area which may be efficiently and economically drained by one well,” and this is to be drilled “approximately in the center thereof,” unless a special exception is granted after notice and hearing. The unit as thus constituted is to be considered as “a developed area as long as a well is located thereon [the unit] which is capable of producing oil and gas in paying quantities.” R.S. 30:9 B and C. But, “the owner[9] of a tract of land in the pool, in *313 order that he may obtain the tract’s just and equitable share of the production of the pool,” cannot be compelled under any order, rule, or regulation of the commissioner, either in its specific "terms or effect,” "to drill and operate any well or wells on the tract in addition to the well or wells” authorized as necessary for the proper development of the property. R.S. 30:9A(1) and (2). (The emphasis has been supplied.)
This legislation further provides that “When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the commissioner,” the owners may voluntarily “pool their interests and * * * develop their lands as a drilling unit.” Where they do not, the commissioner "shall require them to do so.” However, all orders requiring such pooling "shall be upon terms and conditions that are just and reasonable and that will afford the ozvner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool,” the proportionate share of the production allocated to the owner of each tract within the unit being ‘‘considered as if it had been produced from his tract by a well drilled thereon.” It is only when the parties refuse to pool their interests, and the commissioner is judicially declared to have no authority to compel pooling, that the owner “of each tract embraced within the drilling unit may drill thereon.” R.S. 30:10 A(l), (a), (b), and B. (The emphasis has been supplied.)
From the foregoing it is evident that to guarantee the efficient and economical development of a unit without waste, the commissioner’s order creates a compulsory joint venture on the part of all those who then have a right to go upon the land for the purpose of reducing the underlying minerals to possession, and the unit thus created is developed for the joint benefit of all whose respective interests are thus pooled to make development of the unit possible.
In the instant case, the commissioner’s Order 307 creating Unit 11 in the Rayne Field on May 1, 19SS, completely removed from all owners — whether of the land, servitude, or their lessees' — any and all rights then had to go upon any part of this unit for the purpose of reducing the minerals thereunder to possession, clearly erecting an insurmountable obstacle to the exercise of the right of all servitude owners in the unit within the meaning and intendment of Article 792 of the Revised Civil Code, and these rights will remain removed from such owners so long as this order is in effect. Thus, the order clearly deprived the plaintiffs of their right to exercise or use their servitude for the remainder of the 10-year prescriptive period guaranteed to *315 ■them under the partition contract,[10] i. e., for 1 year, 6 months, and 26 days from May 1, 1955, to November 27, 1956. To also •deprive the plaintiffs of their just share of the production from the unit well, as directed by the commissioner’s order and R.S. •30:10A(1) (a), is to take from them the just compensation they were guaranteed for relinquishing their right to go upon the land for this full 10 years and secure the minerals themselves. This clearly constitutes an unconstitutional taking of their ■private property rights for a public purpose without just and adequate compensation.
This court, in all of its decisions, has consistently relegated the effect of the commissioner’s orders to the limitation established in the constitution, i. e., to the protection, •conservation, and replenishment of “the natural resources of the State, and to proMbit and prevent the waste or any wasteful use thereof[11] and it is only for this purpose that private property and contractual rights have been compelled to yield in the public interest[12] In determining the effect of such orders on the private property and contractual rights subjected to the commissioner’s rulings, this court has always, until the decision of the majority in the instant case, taken the view that all orders of the commissioner, to satisfy the constitutional mandate, must follow the legislation passed pursuant thereto, which specifically declares that all such orders must “afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool * * R.S. 30:10A(1) (a). In other words, at the time an owner’s property right is unitized pursuant to the commis *317 sioner’s order, such owner is guaranteed that when the unit is developed under that order, he will receive his just share of the minerals in the common pool. And this has been held to be so whether the party-owned the land, the servitude, or was the lessee of one or both. See, Hood v. Southern Production Co., 206 La. 642, 19 So.2d 336; Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734; Crichton v. Lee, 209 La. 561, 25 So.2d 229; Hunter Co. v. Vaughn, 217 La. 459, 46 So.2d 735; Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615; and Boddie v. Drewett, 229 La. 1017, 87 So.2d 516. (The emphasis has been supplied.)
In the very early decision of Hood v. Southern Production Company, supra, written by the late Chief Justice Charles A. O’Niell, where the effect of Act 157 of 1940 on property and contractual rights of mineral owners was carefully analyzed, this court very aptly observed: “According to the statute and the order itself, the drilling units were established to prevent waste, to avoid the drilling of unnecessary zvells and to protect the correlative rights of the ozxmers of mineral interests in the gas field to share ratably in the prodziction of gas from the common reservoir.” In rejecting plaintiff’s demand to have his mineral lease affecting 100 acres cancelled because of the lessee’s failure "to drill offset zvells to prevent the draining of gas from the leased premises,” the court pointed out that since this acreage had been compulsorily pooled in accordance with Act 157 of 1940, a portion of the tract being placed in a unit in. Section 2 and the remaining- portion in a unit in Section 3, and the drilling of more than one well on each unit was prohibited, the lessee was “forbidden by the orders of the Department of Conservation” to drill a well as offset on the leased premises. (The emphasis has been supplied.)
Five months later, in Hardy v. Union Producing Company, supra, written by the late Justice Rogers, this court, in rejecting the demand of plaintiffs for cancellation of a mineral lease because of “failure of the lessee to drill a well on the leased premises within the primary term,” held that "the right of defendants to drill a well on the 47-acre tract covered by the lease was in effect taken away from them by the orders of the Commissioner of Conservation, with,, however, the right reserved to them, as zveil as to the plaintiffs, to share in the production of the gas produced from the unit in proportion to their ozvnership.” In the course of the opinion the court emphasized that the hands of the defendants “were literally tied as the result of the orders issued by the Commissioner of Conservation,”' and pointed out that they could, thereafter "do nothing whatsoever to prevent the primary term of the lease from expiring without drilling a well thereon." (The emphasis, has been supplied.)
*319 Approximately a year after the Hardy decision, the court, in Crichton v. Lee, supra, with Mr. Justice Hawthorne as the author of the opinion, rejected the demand of servitude owners who had granted a mineral lease and sought its cancellation on the ground “no well had been drilled on the leased premises, nor had any oil or gas been produced therefrom” holding that the order of the commissioner unitizing the Cotton Valley field, and designating the operator who was to develop it, had thereby required the property burdened by the plaintiffs’ servitude to be treated as “one lease, one property, and one tract, and all oil, gas, and other hydrocarbons within said area were unitized, and the lands, royalties, and lease interests contained therein were pooled and communized;” consequently, the "plaintiffs could not themselves drill a well on the land * * * because it constitutes a part of the unitized area of the Cotton Valley Field.” In support of this holding the Hood and Hardy cases were cited with approval, the latter being quoted from extensively. (The emphasis has been supplied.)
In Hunter v. Vaughn, supra, with the late Justice Moise as the author, this court again rejected the demand of a plaintiff to have a mineral lease cancelled because the lessee had failed to drill a well on the leased premises within the primary term, for the reason that the leased property formed a part of a unit created under the authority-vested in the commissioner. In so holding, the order of the commissioner was said to be a “force majeure,” i. e., comparable to an act of God. Consequently, the lessee’s right “to drill a well on the tract * * * was in effect taken away from them by the Order of the Conservation Commissioner,” with reservation to them, however, as well as to the plaintiff, of their right “to share in the production from the unit in proportion to their ownership.” (The emphasis has been supplied.)
Following this jurisprudence, when the case of Sohio Petroleum Co. v. V. S. & P. R. R., supra, came to this court for consideration, we denied the demands of servitude and landowners to have their leases covering lots in the town of Delhi, Louisiana, cancelled for failure to drill thereon within a year, or to pay delay rentals in lieu thereof, pointing out that the property had been unitized by the commissioner’s order and developed by the drilling of a well, and without specific authorization from the commissioner, "another well could not have been drilled on this same unit.” (The emphasis has been supplied.)
And, finally, in Boddie v. Drewett, supra, this court, with Mr. Justice McCaleb as the author, following the articles of the code applicable to servitudes that have, over the years, always been applied in deciding cases involving “fugitive” mineral rights, and upon which the entire structure of our *321 mineral jurisprudence is built, held the commissioner’s order unitizing the 12-acre tract burdened by defendants’ servitude with other property was an "obstacle” which they could “neither prevent nor remove” within the meaning of Article 792 of the Revised Civil Code-, consequently, “the prescription of non-usage does not run against him [the servitude owner] as long as this obstacle remains,”[13] with the result that the unit created by the commissioner’s order, in which it was specifically declared drilling on any tract therein constituted drilling on each and every tract and the owners of each tract were to share ratably in the production when the unit was developed, was a use of the servitude within the ten-year prescriptive period, taking into consideration the time during which the accrual of the prescription was suspended by operation of law because of such order. The Hardy and Sohio cases are cited as authority. (The emphasis has been supplied.)
The majority here, in refusing to follow the holding in the Boddie case because it is assertedly “inconsistent with the objectives, aims and policies of our conservation law,” and substituting an entirely new concept in the mineral field, allegedly predicated upon “certain basic principles which we hold to be indisputable,” has obviously overlooked the rule of law long prevailing in this state to the effect that “The decisions of the highest court of a state, on the subject of * * * mineral rights, establish rules of property; and they should not be reversed even though a contrary rule might be deemed more logical, unless it be by an act of the Legislature.” Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 82 A.L.R. 1264. See, also, Farmer’s Heirs v. Fletcher, 11 La.Ann. 142; Cunningham v. Steidman, 133 La. 44, 62 So. 346; Minnesota Mining Co. v. National Mining Co., 3 Wall. 332, 18 L.Ed. 42; Truskett v. Closser, 236 U.S. 223, 35 S.Ct. 385, 59 L.Ed. 549; and Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856. (The emphasis has been supplied.)
Moreover, the majority has overlooked the long line of jurisprudence that has developed on this subject during the many years, particularly those hereinabove discussed, referring to the case of Boddie v. Drewett only. In fact, the majority opinion reflects a complete departure from this jurisprudence and the basic principles upon which it is predicated without overruling or mentioning it.
I have searched the majority opinion in vain for any sound or logical reason for such a departure from this jurisprudence and the codal articles; for the “certain basic principles” said “to be indisputable” revealing this long line of jurisprudence— *323 and particularly the one in Boddic v. Drewett — is “inconsistent with the objectives, aims and policies of our conservation law;” and for reasons that in any way support the conclusion reached by the majority, as is very ably demonstrated in the dissenting opinion of Mr. Justice McCaleb. In fact, the constitution, the conservation statute, and the jurisprudence eloquently reveal the majority holding is, itself, “inconsistent with the objectives, aims and policies of our conservation law.”
It is true, as the majority opinion points out, that owners acquire mineral servitudes with knowledge their use of them will be subject to “lawful regulations.” But the majority overlooks that owners also acquire servitudes with knowledge that under the constitution and conservation statute, as construed and applied in this court, their right to exercise their servitude during the full 10-year period as granted in Article 789 will not be taken away from them unless they are afforded "the opportunity to * * * receive” their "just and equitable share of the oil and gas in the pool” when the unit is developed. R.S. 30:10A(1) (a). Clearly they could not foresee that this court, in striking down this jurisprudence and deleting R.S. 30:10A(1) (a) from the conservation statute, would exercise prerogatives that, under our triumvirate form of government, lie exclusively within the province of the legislature. (The emphasis has been supplied.)

. Under the partition of the Mire tract it was divided into 6 lots containing approximately 25 acres each, plaintiffs acquiring Lot 1. Although in selling this lot April 11, 1957, they reserved the minerals thereunder, they, in fact, reserved nothing, as all minerals under the property were then outstanding in a full undivided mineral servitude, plaintiffs being owners of %th of such servitude on the entire 152 acres by reason of the partition, and their co-heirs, being owners of the remaining undivided %ths on this entire tract. See, Long-Bell Petroleum Co. v. Tritico, 216 La. 426, 43 So.2d 782, on rehearing. However, since defendants did not appeal from the district court judgment recognizing ownership of a %th interest in the minerals in plaintiffs under this purported second servitude, and did not seek writs from the appellate court judgment affirming the district court in this respect, this phase of the matter is not before us for decision.

. According to the experts, the portion of the Mire tract within Unit 11 is the only portion of the entire 152 acres that would be productive.

. This conclusion has no basis in fact or in law. It is absurd to say the servitude owner could have drilled, or have had the operator drill, a well on the portion of the Mire tract lying within the so-called “permissible drilling area,” for only the operator designated by the commissioner and acting under the commissioner’s control could select the site for the only well that could be located anywhere on the unit, including the “permissible drilling area.” The commissioner’s order, in other words, stopped all mineral development on Unit 11 by anyone other than the operator acting through the commissioner for the public good. And while the exception was under consideration that resulted in the revision of the original Unit 11, not oven the operator could drill on this unit.

. Some 3.05 acres of the Mire tract lay within this area under Order 307, being the shaded portion of Block A of Unit 11 on the attached plat.

. Some 7.60 acres of the tract lay within this area under Order 307-b, being the shaded portion of Block B of Unit 11 on the attached plat.

. Under the jurisprudence, the portion of plaintiff’s servitude outside the unit was divided from that lying inside for development purposes. The portion inside was then under the control of the commissioner, to be developed as he decreed. If the portion outside was not developed by the servitude owner (or anyone having the right to go upon the land to reduce the minerals to possession) within 10 years, it prescribed. See, Childs v. Washington, 229 La. 869, 87 So.2d 111; and Jumonville Pipe & Mach. Co. v. Fed Land Bank, 230 La. 41, 87 So.2d 721. The conclusion that drilling on the portion of the tract outside the unit would have interrupted proscription as to the servitude covering the entire 152 acres is, therefore, clearly erroneous.

. The trial judge also held that inasmuch as there had been no horizontal unitization of the Bayne Field other than as to the Nodosaria “A” Sand, plaintiffs’ servitude .could also have been used in other sands throughout the entire 152 acres. However, aceoi-ding to the experts, the Nodosaria “A” Sand was the only productive sand under the tract.

. This plat is not to an exact scale, hut it is a fair approximation. Information explaining the plat, in so far as pertinent to a decision, is typed beneath it.

. “Owner” is defined in the statute as “the person who has the right to drill into and produce from a pool and to appropriate the production either for himself or for others.” R.S.30.3(8). (The emphasis has been supplied.)

. Indeed, under tlie majority decision, had the unit been established December 26, 1946, 1 month after the servitude fell to the plaintiffs in the partition proceeding, they would have been deprived of this valuable property without compensation for a period of 9 years and 11 months, despite the guarantees of the contract effecting tlie partition.

. Section 1 of Article VI of the Constitution of 1921, and subdivision (D) of this same section as amended in 1944.

. The conservation of mineral resources is not accomplished by taking these minerals from a certain class of owners who have pooled their interests to make development of the unit possible and giving them to another class. But their preservation, and the prevention of waste, is accomplished by compelling all mineral •owners, of whatever class, to draw their proportionate share of these resources through the only well permitted to be drilled on the unit unless an exception is granted. It is under this premise, and to this extent alone, that the individual owners of all classes who have the right to go upon the land and reduce these resources to possession must yield to the public interest. As compensation they are guaranteed their just share of these minerals when produced will be given to them. Under the contract whereby they secure the servitude or lease, they know the land may bo subject to unitization, and they will have to surrender the right to go upon the land, but they do not contemplate, nor do they intend, that such unitization will take their property from them to the unjust enrichment of another class of owners.

. Article 792 of t Revised Civil Code.