**J. W. BENNETT et al., Plaintiffs,**

**v.**

**SINCLAIR OIL & GAS COMPANY, Defendant.**

**Civ. A. No. 11716.**

United States District Court
W. D. Louisiana,
Monroe Division.

Nov. 9, 1967.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Robert J. Moffatt, Simon Herold, Shreveport, La., for plaintiffs.

Frank S. Kennedy, Naff, Kennedy, Goodman & Johns, Shreveport, La., for defendant.

BEN C. DAWKINS, JR., Chief Judge.

## RULING ON THE MERITS

Plaintiffs [1] seek cancellation of three separate mineral leases executed in favor of defendant [2] as lessee. The specifics of the complaint allege that Sinclair has: 1) failed to tender shut-in royalties as provided by the leases; 2) allowed lands covered by the leases to be wrongfully drained; and 3) failed to release the lands subject to the leases to plaintiffs after timely demand. Alternatively, plaintiffs seek partial cancellation of the leases involved. There is also a prayer for attorney's fees in the event plaintiffs are successful in this action. Our jurisdiction rests upon 28 U.S.C. § 1332, diversity of citizenship, and involves the requisite amount in controversy. Litigation arose pursuant to the following facts:

■ May 19, 1960, R. D. Bennett executed a mineral lease [3] in favor of Sinclair covering the land designated in Plaintiffs' Exhibit 4 and Defendant's Exhibit 2 as "Lease No. 1." The lease provides for a primary term of 5 years, and contains other standard clauses, including the habendum clause, the shut-in royalty clause, the regular royalty clause and the delay rental clause. Also included was what is commonly referred to as a "Pugh Clause." [4]

August 25, 1960, two additional leases [5] were executed by J. W. Bennett et ux to Sinclair with terms identical to those contained in the original R. D. Bennett lease. These two leases are also graphically depicted in Plaintiffs' Exhibit 4 and Defendant's Exhibit 2. Through mesne conveyances, plaintiffs acquired the royalty interest in the R. D. Bennett lease.

During the primary term of the three leases, delay rentals were tendered in the following manner: (1) on Lease # 1 for the full primary term of five years; (2) on Leases # 2 and 3 for the first three years of the primary term. These payments were uncontroverted and accepted by plaintiffs. Delay rentals were also tendered for leases # 2 and 3 after they had been included in a forced drilling unit established by the Louisiana Commissioner of Conservation. Unitization of the leased lands took place in the following way.

Commissioner's Order No. 397–B–10–a, [6] effective December 1, 1962, pooled and unitized all interests within what was known as the Cadeville Sand which included small portions of lands covered by Leases # 2 and 3, owned by plaintiffs. Subsequent orders of the Commissioner, made effective as of February 1, 1965, [7] enlarged the original unit and included additional acreage owned by plaintiffs. At this time, none of the acreage in Lease # 1 had been placed within the unitized area.

April 1, 1965, Sinclair requested that the Commissioner of Conservation call an emergency hearing for the purpose of establishing a new unit which would include parts of Leases # 2 and 3 and

---

1. Plaintiffs include J. W. Bennett, Syble Usrey Bennett, Robert L. Cone, Willa Bennett Cone, Patrick Lloyd Cone, Michael James Cone and Shelia Cone.

2. Hereinafter referred to as "Sinclair."

3. Hereinafter referred to as "Lease # 1."

4. These clauses are set forth in full in Plaintiffs' Exhibits 1, 2, and 3. The "Pugh Clause" reads as follows:

"6. * * * If operations be conducted on or production be secured from land in such pooled unit other than land covered by this lease, it shall have the same effect as to maintaining lessee's rights in force hereunder as if such operations were on or such production

from land covered hereby, *except that its effect shall be limited to the land covered hereby which is included in such pooled unit.*" (Emphasis added with Pugh Clause in italics.)

5. Hereinafter referred to as "Leases # 2 and 3."

6. See Plaintiffs' Exhibit 17 and Defendant's Exhibit 9.

7. Commissioner of Conservation's Orders No. 397–B–10–b, 397–B–10–c, and 397–B–10–d which are Plaintiffs' Exhibit 18 and Defendant's Exhibit 10; Plaintiffs' Exhibit 10 and Defendant's Exhibit 11; and Plaintiffs' Exhibit 20 and Defendant's Exhibit 12, respectively.

all of Lease # 1.[8] After a duly authorized hearing, the Commissioner promulgated Order No. 397–B–11 [9] unitizing the lands mentioned above, said order being effective from May 11, 1965. Prior to issuance of this order, Sinclair had, on April 14, 1965, spudded a well on tract # 3 which was completed as a producer sometime in May or June. After completion, the well was shut-in on or about June 13, 1965. August 19, 1965, Sinclair tendered shut-in royalty to plaintiffs, which royalty was designated as applicable to Lease # 1. This royalty check was never cashed. No shut-in royalty payment applicable to Leases # 2 and 3 has ever been made.

Subsequently, on October 20, 1965, the Commissioner issued Order No. 397–B–10–e [10] which further enlarged the unit known as the Cadeville Sand Unit, Calhoun Field. In this enlargement, additional portions of Leases # 2 and 3 were taken in as well as a substantial portion of Lease # 1. This order became effective November 1, 1965. Thus, the respective positions of the parties became fixed with reference to the unitized lands.

Interspersed with the above activities, the complaint alleges that in October of 1963, plaintiffs notified Sinclair, by letter from counsel,[11] that in their opinion certain portions of their lands were being drained by mineral production on adjacent premises. This letter formed part of the basis of plaintiffs' claim for damages due to drainage, and a copy thereof was introduced into evidence. Further complicating matters, Sinclair denies ever receiving the letter. Having set forth the facts, we now undertake to decide the issues. First is the claim for total cancellation.

■ Plaintiffs base their claim for total cancellation of Leases # 2 and 3

on the following provision of the leases in question:

"3. The royalties to be paid by lessee are:

\* \* \* \* \* \*

(c) Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50.00 per well per year, payable quarterly, and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract." [12]

In this regard, plaintiffs allege that when the J. W. Bennett-Sinclair Well # 1 was completed and shut-in, Sinclair was bound to pay shut-in royalties because they chose not to produce the well. Sinclair contends that no shut-in payment was due because prior to the expiration of the primary term, portions of Leases # 2 and 3 were included in the Cadeville Sand Unit, and that production from that unit at all times kept both leases in full force and effect. Succinctly, Sinclair's position is that because there was *actual* production in paying quantities legally attributable to the entirety of the leased premises, there was no necessity for shut-in payments which are treated as *constructive* production *in lieu* of actual production.[13]

Plaintiffs allege that when the additional well was completed Sinclair incurred additional obligations. Specifically, they say, Sinclair had to produce the well or tender the proper shut-in royalty. Thus, we are presented with an issue which may be best articulated by a hypothet identical to the facts of this case, to wit: mineral leases are partially included within a compulsory drilling unit established by the Commissioner of Conservation, and a producing well, located

8. For illustration of these various units and their effect on the lands in question see Defendant's Exhibit 4.

9. See Defendant's Exhibit 14.

10. See Defendant's Exhibit 13.

11. A copy of this letter is in the record as Plaintiffs' Exhibit 12.

12. Clause 3(c) of Bath's Form Louisiana Spec. 14BR1–2A, Oil, Gas and Mineral Lease.

13. This view was expressly set forth in Davis v. Laster, 242 La. 735, 138 So.2d 558, 562, 96 A.L.R.2d 332 (1962).

in the unit, but off the leased premises, is producing in paying quantities. Later, a second well is completed within the unit and upon the leased premises but is shut-in. Does production from the first unit well maintain the leases as to all acreage under lease and also dispense with the obligation to pay shut-in royalties applicable to the second well? It should be borne in mind that we decide this issue without deciding whether the "Pugh Clause" "divides" the various leases. In other words, our chief concern is the effect such production has on the obligation to pay shut-in royalties. Resolution of this issue may be obtained only after careful scrutiny of the leases in question and application of pertinent principles of Louisiana law.

Aiding in solution of this problem is the following language found in all three leases:

"2. Subject to the other provisions herein contained, this lease shall be for a term of 5 years from this date (called 'primary term') *and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.*" (Habendum Clause with emphasis added.) [14]

This provision, read in conjunction with the previously quoted portion of the shut-in royalty clause, (Clause 3, supra,) leaves no doubt as to what the parties intended. Under the express terms of these leases, actual production from the leased premises *or* "land with which said land was pooled" would maintain the leases in force as long as such production continued. Shut-in royalty payments were to be considered as if gas was being produced within the meaning of the Habendum Clause (Article 2). In other words, shut-in payments were required under these leases only in the absence of actual production in paying quantities from *any* well, *and* a well capable of producing in paying quantities having been completed but shut-in due to a lack of

market or demand for its gas production. Our decision is buttressed by the following language of the Louisiana Supreme Court in Davis v. Laster:[15]

"* * * Once, therefore, drilling operations have commenced, the lessees are relegated to continuing drilling operations, or the payment of shut-in royalties, or actual royalties to maintain the lease, or, where production ceases, resumption of delay rentals * * *" (138 So.2d at 562)

Similarly, we note the following language of the Court in Sohio Petroleum Co. v. V. S. & P. R. R.,[16] construing a shut-in royalty provision similar to the one in the instant case:

"Article 3 of the lease [shut-in clause], relied on by the plaintiffs as an alternative ground for the cancellation of their leases, does not provide for a forfeiture of the lease in the event of the failure of the lessee to pay the shut-in well fee or royalty of $50.00 a year. The payment of this royalty is not made a condition precedent for the continuation of the lease. Instead, the provision makes it optional with the lessee to make such payment if he wants it 'to be considered that gas is being produced within the meaning of Article 2' of the contract, i. e., the primary term is to be continued so long as minerals are produced." (62 So.2d at 620)

These pronouncements by the highest court of Louisiana leave no doubt that where there is actual production attributable to a mineral lease, there is no additional obligation to tender shut-in royalties in the event a second well capable of producing in paying quantities is shut-in on the leased premises. Where there is actual production in paying quantities, the necessity for constructive production does not exist. Of course, the parties are at all times free to contractually provide for a different result than the one we reach in this particular instance.

14. Clause 2 of Bath's Form Louisiana Spec. 14BR1–2A, Oil, Gas and Mineral Lease.

15. 242 La. 735, 138 So.2d 558, 96 A.L.R. 2d 332 (1962).

16. 222 La. 383, 62 So.2d 615 (1953).

Such indeed was the case in a recent decision by this Court where the parties stipulated such a conclusion.[17]

Relative to plaintiffs' claim for total cancellation of Leases # 2 and 3 for failure to pay shut-in royalties, we note that plaintiffs have failed to introduce any evidence of a lack of market or demand for the gas production from the J. W. Bennett-Sinclair # 1 Well. By failing to come forward with sufficient evidence to support this allegation, plaintiffs afford another ground for denying their claim in this respect. While not necessary to our decision of this issue, we believe that the following finding of the Commissioner of Conservation in Order No. 397–B–10–e is dispositive of this allegation. We quote from that Order as follows:

"The Commissioner of Conservation finds as follows:

1. That the Marathon Oil Company, et al.—T. J. Green # 1 Well located in Section 1, Township 17 North, Range 2 West, Jackson Parish, Louisiana, and the Sinclair Oil & Gas Company—J. W. Bennett # 1 Well, located in Section 5, Township 17 North, Range 1 West, Jackson Parish, Louisiana, have been completed in the Cadeville Sand; and it has been established by all geological and engineering data that the reservoir in which said wells are completed is pressure connected with and a part of the same reservoir as the Cadeville Sand of the Calhoun Field, which has heretofore been pooled and unitized on a reservoir-wide basis, pursuant to the provisions of Order No. 397–B–10–a, dated December 4, 1962, and Order No. 397–B–10–b, dated October 23, 1963, and which has heretofore been enlarged by Order No. 397–B–10–c, dated November 27, 1963, and Order No. 397–B–10–d, dated January 26, 1965."

From this finding it is eminently clear that the two wells referred to are pressure connected in the *same identical* unit, and that the unit can best be drained by the Marathon Oil—T. J. Green Well alone.

 As a final argument for total cancellation of Leases # 2 and 3, plaintiffs contend that the royalty payment for December, 1965 was never paid them. This contention is clearly without merit. Without unduly belaboring the point, Sinclair's supervisor of gas sales, comptroller's department, Don Fann, testified that there was a delay in the December royalty payment because the Cadeville Sand Unit had just been enlarged thus *increasing* plaintiffs' share in the royalty payments. Due to this enlargement and *increase* due plaintiffs, Sinclair was forced to adjust the input data fed into their computer so that a proper payment would be made. His testimony establishes without doubt that plaintiffs were properly paid for the month of December,[18] and the orders of the Commissioner add additional credence to Fann's explanation of the delay. Pursuant to the foregoing analysis, plaintiffs' demands for total cancellation of Leases # 2 and 3 are hereby rejected.[19] Next is the

---

17. Nordan-Lawton Oil and Gas Corp. v. Miller, 272 F.Supp. 125 (W.D.La.1967).

18. Transcript pp. 91–106.

19. Plaintiffs' reliance on the cases of Fontenot v. Sunray-Mid-Continent Oil Co., 197 So.2d 715 (La.App.3d Cir. 1967) and Sellers v. Continental Oil Co., 168 So.2d 435 (La.App.3d Cir. 1964) is without merit. In these cases lessees delayed 30 and 33 months respectively before tendering royalty payments and gave no explanation for such delay. In the instant case there was no such delay and the payment by lessee in August 1965, was not such as would constitute an active breach giving grounds for cancellation under the decisions in Sellers, supra; Pierce v. Atlantic Refining Co., 140 So.2d 19 (La.App.3d Cir. 1962); Bailey v. Meadows, 130 So.2d 501 (La. App.2d Cir. 1961) are similar decisions. A lessor is not entitled to cancellation where adequate reason for delay in royalty payment is given by the lessee (Broadhead v. Pan American Petroleum Corp., 166 So.2d 329 (La.App.3d Cir. 1964); Fawvor v. U. S. Oil of Louisiana, Inc., 162 So.2d 602 (La.App.3d Cir. 1964). In the instant case there was no delay which reasonably was unexplained.

claim for total cancellation of Lease # 1.

■■ With reference to Lease # 1, delay rentals were paid initially for the duration of the five-year primary term. However, shortly before expiration of that term, Lease # 1 was totally included in a compulsory drilling unit established by the Commissioner.[20] After completion of a well in that unit, the well was shut-in June 13, 1965, and plaintiffs were tendered shut-in royalties on August 19, 1965. This payment was refused on two grounds: (1) the payment was designated for a six-month period when the lease stipulated for quarterly payments; (2) the payment was premature in that the payment was designated for a period beginning May 29, 1965, when in fact the well was not completed until June 13, 1965.

Viewing the evidence as a whole and in a light most favorable to plaintiffs, we find the dispute over the completion date of the well involved a mere technicality based on whether the well should have been deemed "completed" when the "Christmas tree" was installed or when the liner was perforated. We fail to see the significance this distinction has in this case. In no event have petitioners been prejudiced by the payment with respect to Lease # 1 and they certainly have not been injured by a payment which represents more than they were due.[21] Notification of refusal of this payment was not given Sinclair until October 27, 1965, when counsel for plaintiffs wrote demanding release of the lands covered by the respective leases. One week earlier, October 20, 1965, the Commissioner of Conservation issued Order No. 397–B–10–e which included substantial portions of Lease # 1 in the Cadeville Sand Unit and increased again plaintiffs' share in production from all three leases.

Similarly, we fail to see any merit in the contention that the lease should be cancelled because the payment was for a six-month period instead of quarterly. Again plaintiffs have not been prejudiced by this payment, and they have alleged none. The amount of the check is not in dispute, and unless they can show injury resulting from these actions of defendant, they are not entitled to relief. Thus we must reject plaintiffs' demands for total cancellation of Lease #1.

■ Alternatively plaintiffs contend that, in the event this Court finds they are not entitled to total cancellation of the leases in question, they are entitled to partial cancellation under Clause 6 of each of the leases which provides in part:

"6. * * * If operations be conducted on or production be secured from land in such pooled unit other than land covered by this lease, it shall have the same effect as to maintaining lessee's rights in force hereunder as if such operations were on or such production from land covered hereby, *except that its effect shall be limited to the land covered hereby which is included in such pooled unit.*" (Emphasis added with Pugh Clause in italics.) [22]

Under the above quoted portion of Clause 6, particularly that italicized, plaintiffs contend that the leases have been divided and that therefore they are entitled to a release of all lands outside of the unit boundaries. Plaintiffs argue that the portions of the leased premises outside the unit boundary are no longer subject to the leases because the effect of the unit operations is limited "to the land covered * * * which is included in such pooled unit." At first blush, we were inclined to agree with plaintiffs in this contention. However, a thorough review of applicable principles of law as well as a reading of the lease as a whole compels a different result in favor of defendant.

20. Order No. 397–B–11.

21. See Davis v. Laster, supra.

22. Clause 6 of Bath's Form Louisiana Spec. 14BR1–2A, Oil, Gas and Mineral Lease.

Clause 6, commonly referred to as the "pooling clause," begins in the following manner:

"6. If at any time while this lease is in force and effect *lessee in its opinion* deems it advisable and expedient * * *" (Emphasis added.)

From this introductory wording of Clause 6 it becomes clear that the type of pooling referred to in that clause was voluntary pooling initiated by Sinclair and not compulsory pooling and unitization orders issued by the Commissioner of Conservation. In other words, voluntary pooling by the lessee would be within the contemplation of the parties, being expressly provided for in the lease. Conversely, a forced unitization and pooling order by the Commissioner would not be within the ambit of the intention of the parties under Clause 6 because no provision for such action existed *in the lease*. As we have pointed out, with reference to the shut-in royalty clause, the parties were at all times free to contractually provide for a different result. No such provision exists in the instant case.

Plaintiffs are quick to argue that such a division was upheld in Broussard v. Phillips Petroleum Co.[23] in a voluntary unitization, and therefore the same result should prevail in a compulsory unit. Sinclair contends that Louisiana courts have recognized a dichotomy with respect to voluntary and compulsory units and that where the latter type of unitization is in force, a "Pugh Clause" will not operate to divide the lease. In supporting its position, defendant relies principally on Smith v. Carter Oil Co.,[24] which involved a "Pugh" clause identical to that in the instant case. After a thorough review of Louisiana jurisprudence, the Court in *Smith* reasoned that a compulsory order issued by the Commissioner would not have the effect of dividing the lease as would a voluntary act by the lessee under the Pugh Clause found in

Clause 6. Therefore, the claim for division was denied. This decision was cited with approval recently by the Second Circuit Court of Appeal of Louisiana,[25] but the Louisiana Supreme Court decided the case on other grounds [26] and did not decide the issue presented herein.

Admittedly, there is little jurisprudence on this particular point, but the decisions which have been rendered by the Louisiana courts clearly indicate that the Pugh Clause is inoperative where there is a compulsory unit established by the Commissioner of Conservation. One plausible explanation for this reasoning might be the strong mandate found in Hunter v. Shell Oil Co.[27] and similar cases which stand for the proposition that the oil and gas lease is an indivisible obligation in the absence of express provision to the contrary.

In continuing their argument for partial cancellation and thus a division of the three leases, plaintiffs urge that Sinclair has by its actions consented to a division of the leases. They allege that Sinclair continued to pay delay rentals relative to Leases # 2 and 3 after they had been partially included within the Cadeville Unit. Plaintiffs allege such action is in contradiction to Sinclair's argument that production from the Cadeville Sand maintained the leases in their entirety. In answering this, Sinclair takes the position that many oil companies often tender rentals or royalties in such situations in order to protect themselves against litigation similar to this case, and that no citation of authority is needed to support such action. We agree. This "over-cautious" attitude has been cultivated in part by the scarcity of definitive legislation pertaining to mineral law in Louisiana, and the corresponding burden placed on State courts to establish such principles on a pragmatic, or *ad hoc,* case by case basis. In keeping with the foregoing analysis, plaintiffs'

23. 160 F.Supp. 905 (W.D.La.1958).

24. 104 F.Supp. 463 (W.D.La.1952).

25. Odom v. Union Producing Co., 129 So. 2d 530 (La.App.2d Cir. 1961).

26. Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649 (1962).

27. 211 La. 893, 31 So.2d 10 (1947).

demand for partial cancellation is rejected.

In claiming $30,000 for drainage damages, plaintiffs contend that Sinclair was notified that such drainage was taking place by letter from their attorney, William H. Baker, dated October 28, 1963. Sinclair denies receiving this letter. Apparently no further action was taken concerning this matter until suit was filed by plaintiffs some two years later. At trial, plaintiffs, through testimony of Robert Turnham,[28] a petroleum engineer, introduced evidence concerning the amount of drainage which had taken place from their lands during the period from December 1, 1962, to November 1, 1965. Turnham's calculations were based on what he found to be the difference between the original pressure in the Cadeville Sand Unit and the J. W. Bennett-Sinclair # 1 Well. The pressure in the Bennett well was some 2,081 pounds less than the original pressure of the unit, and Turnham explained that in his opinion this difference was due to reservoir drainage by wells on adjacent premises. In addition, Turnham testified that every time the unit was enlarged Sinclair's tract participation factor decreased while plaintiffs' increased, thus raising the question whether Sinclair made a *bona fide* effort to secure proper unitization to insure to plaintiffs their proper share of the gas being produced from the reservoir.

Until recently, Louisiana courts were reluctant to recognize a cause of action for drainage from a lessor's lands unless an obligation to protect against this drainage was expressly provided for in the lease itself. However, the Third Circuit Court of Appeal of Louisiana, in Breaux v. Pan American Petroleum Corp.,[29] declared that such obligation existed on an implied basis if the lease was silent on this matter. Thus we examine the actions of Sinclair to see if they are responsible to plaintiffs for the alleged drainage.

■■■■ We note that during the period plaintiffs allege that their lands were being drained, continuous re-evaluation of all pertinent geological data of that area was being made by the Commissioner of Conservation with the result that the Cadeville Sand Unit underwent several enlargements,[30] all beneficial to plaintiffs. We must assume that the orders of the Commissioner were valid and represented a sharing arrangement which properly recognized the correlative rights of each owner entitled to participate. Thus we think plaintiffs' claim that they did not receive their equitable share of production from the reservoir is not substantiated by the evidence.

■■■■ In addition, Louisiana law clearly requires a putting in default as a prerequisite to recovery of damages due to a passive breach.[31] Such putting in default may be accomplished in one of several ways explicitly set forth by the Louisiana Civil Code.[32] A demand in writing for performance will suffice for such default which returns us to the matter of the letter from Baker to Sinclair.

■■■■ The evidence concerning receipt of this letter is directly in conflict. However, other actions by both parties lead us to the conclusion that Sinclair did not in fact receive the letter.

Specifically we note that when counsel for plaintiffs wrote Sinclair in October, 1965, demanding release of the lands in question, he immediately received a reply from Sinclair's lease department[33] setting forth Sinclair's position which eventually prompted this lawsuit. We conclude that if a letter concerning drainage had been received by Sinclair, a similar response to the one mentioned above would have been mailed. We also note

28. Transcript p. 37 et seq.

29. 163 So.2d 406 (La.App.3d Cir. 1964).

30. These orders are set forth in Note 7, supra.

31. LSA–Civil Code art. 1933.

32. LSA–Civil Code art. 1911.

33. See Plaintiffs' Exhibit 22.

that during the interval of the letter dated October 28, 1963, and October, 1965, petitioners took absolutely no action concerning the drainage allegation, a period of some two years. Such action, or rather inaction, is in direct opposition to the very language of the earlier Baker letter from which we quote as follows:

> "Therefore, this letter will constitute demands upon you for immediate development of the above or for the leases to be released.

> "In the event that the above is not done immediately, suit will be instituted." [34]

The fact that no suit was instituted, coupled with the additional evidence that when plaintiffs finally demanded release by letter in 1965, they did not in any way mention the alleged drainage,[35] constrains us to hold that Sinclair did not receive the Baker letter. We do not mean to say or in any way indicate that landowners similarly situated should be obliged to "hound" their lessees to carry out obligations which are clearly theirs to perform. On the other hand, some indication of a *bona fide* demand by the lessor should be proven. Such demand is lacking in this case.

It has been suggested that a strong argument can be made that default should not be required, except possibly by express provision of the lease, even if the drainage is caused or permitted by one other than a lessee of the drained tract.[36] On the other hand, the Louisiana courts have adopted an active-passive dichotomy relative to the requirement of putting in default—default being required where there is a passive breach and not being required where there is an active breach. Because plaintiffs have failed to prove their allegations of drainage by a clear preponderance of the evidence, we find it unnecessary to pass upon this point. Accordingly, plaintiffs' claim for drainage damages are rejected.

Summarizing, in accordance with our findings of law and fact, all of plaintiffs' demands are rejected and judgment will be entered in favor of defendant. A proper decree should be presented.

---

34. Copy of letter from attorney William H. Baker to Sinclair dated October 28, 1963, Plaintiffs' Exhibit 12.

35. Copy of letter from attorney William H. Baker to Sinclair dated October 27, 1965, Plaintiffs' Exhibit 14.

36. See The Work of the Louisiana Appellate Courts for the 1963–1964 Term—Mineral Rights, 25 La.L.Rev. 360, 365 (1965).