381 So.2d 1286 (1980)
James Presley BERNARD et al., Plaintiffs-Appellants,
v.
MARATHON OIL COMPANY et al., Defendants-Appellees.
No. 7475.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1980.
Writ Refused May 9, 1980.
Edwards, Stefanski & Barousse, Homer Ed Barousse, Jr., Crowley Deshotels & Deshotels, O. H. Deshotels, Jr., Kaplan, for plaintiffs-appellants.
Plauche, Hartley, Lapeyre & Ottinger, Patrick S. Ottinger, Lafayette, and Burton B. Bossley, Jr., Houston, Tex., for defendants-appellees.
Before DOMENGEAUX, FORET and SWIFT, JJ.
DOMENGEAUX, Judge.
This is a suit by the heirs of Andrew Bernard against Marathon Oil Company, et al, to have an oil, gas, and mineral lease affecting a tract of land in Vermilion Parish, Louisiana, declared terminated.
The chronology of the important facts, which have been stipulated to by the parties, is as follows:
On January 16, 1961, Andrew Bernard granted to the Ohio Oil Company an oil, gas, and mineral lease affecting an eighty (80) acre tract of land in Vermilion Parish, Louisiana. (A rough, unscaled sketch of *1287 the 80 acre tract is furnished solely to aid the reader in visualizing the manner in which the property is affected by the lease and the units discussed below.) Plaintiffs, as heirs of Andrew Bernard, are the present lessors under this lease, and defendant Marathon Oil Company, as the successor to the Ohio Oil Company, is the present lessee under this lease.

On March 19, 1962, by Order No. 367-4 of the state Department of Conservation, effective April 1, 1962, the Cristellaria No. 6 Sand Unit was created. The S. Hebert Well served as the unit well. This unit contained 9.9067 acres of the 80 acres leased. (See sketch, Tracts A and B).
By Department of Conservation Order No. 367-A-3 effective April 1, 1962, The Siphonina Davisi No. 1 Sand was unitized and included 1.4063 acres of the leased property included in the above mentioned Cristellaria unit (Tract A). The Siphonina Davisi No. 1 Sand Unit has produced continuously since the effective date of its creation on April 1, 1962, to date, and royalties have been continuously paid to petitioners to the date of trial.
On April 1, 1962, the Ohio Oil Company released all acreage covered by the lease lying outside of the Cristellaria No. 6 Sand Unit (Tract C). This release was executed in accordance with covenants contained in the lease. Thus, only 9.9067 acres of the original 80 acre tract remained held under the lease (Tracts A and B).
In September, 1974, Hurricane Carmen threatened the coastal parishes of Louisiana, and, in particular, posed a threat to the safety and security of the wells situated in the Theall Field Area, Vermilion Parish, Louisiana, the site of the wells discussed herein. As a precautionary measure, the S. Hebert Well (the unit well for the Cristellaria No. 6 Sand Unit) was shut-in on September 8, 1974. After the threat of Hurricane Carmen had dissipated, attempts were promptly made to restore this well to production. Due to excessive water production the well would not flow. A service contractor then conducted swabbing operations in a further attempt to restore production, but to no avail.
On May 1, 1975, The Siphonina Davisi No. 3 Sand Unit was created by Department of Conservation Order No. 367-D-1. This unit included all of the 9.9067 acres of the Bernard property still held under lease by Marathon and included in the Cristellaria No. 6 Sand Unit[1] (Tracts A and B). The unit well for this unit was the Goldking Well and has produced continuously as a unit well from May 1, 1975, to the date of the trial.
The S. Hebert Well, the unit well for the Cristellaria No. 6 Sand Unit, was finally restored to production in December of 1976 as a result of increase in tubing pressure which accumulated over a long period of time. Production royalties attributable to this well have been paid to plaintiffs from December 21, 1976, to the time of trial.
Plaintiffs now seek to have the lease cancelled as to the 8.5004 acres contained within both the Cristellaria No. 6 Sand Unit and the Siphonina Davisi No. 3 Sand Unit (Tract B only). Plaintiffs contend that the *1288 lease should be cancelled because of any one of three reasons: (1) The S. Hebert Well was shut-in for a period in excess of sixty (60) days before production was resumed; (2) defendants failed to pay shut-in royalties; and (3) defendants were required under the lease to release the acreage lying within the Cristellaria No. 6 Sand Unit when the S. Hebert Well was not restored to production within sixty (60) days after the cessation thereof.
Providing reasons with which we agree, the trial court disposed of plaintiffs' contentions in the following manner:
"First, plaintiffs assert that the lease should be cancelled because the S. Hebert Well was shut-in in September of 1974 and did not resume production until December of 1976. The 8.5004 acre tract which was in no other unit (at that time) was therefore without production from September, 1974, (when the S. Hebert Well was shut-in) until May 1, 1975, when the Goldking unit (Siphonina Davisi No. 3) became effective. As a result, plaintiffs contend, the lease as to this acreage should be terminated because of defendants' failure to rework and resume production of the . . . [S. Hebert] unit well within sixty (60) days after the shutting-in of the well.
Plaintiffs' argument is primarily based upon the following portion of the lease:
`. . . If, after the primary term and after the discovery of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause, this lease shall terminate unless the Lessee resumes or restores production, or commences additional reworking or mining operations within sixty (60) days thereafter and continues such operations with diligence without more than sixty (60) days elapsing from the cessation of work on one well and the commencement of reworking operations or operation for drilling of another unit until such production is restored.'
It is the opinion of this Court that this provision of the lease is not applicable in this situation. As noted above, the well for The Siphonina Davisi No. 1 Sand (the southernmost part of the leased tract, containing 1.4063 acres) has produced continuously since April, 1962, to the present. After the primary term of an oil, gas and mineral lease and unless the lease contains a provision to the contrary (i. e., a "Pugh Clause")[[2]], production from the leased premises or lands pooled therewith serves to maintain the entire lease in effect. Hunter Co. v. Shell Oil Company, [211 La. 893], 31 So.2d 10 (La.1947); LeBlanc v. Danciger Oil & Refining Co., [218 La. 463], 49 So.2d 855 (La.1950). As a result, the production from The Siphonina Davisi No. 1 unit well served to maintain the rest of the lease in effect (i. e., The Siphonina Davisi No. 3 Sand, the 8.5004 acre tract [which was also included in the Cristellaria No. 6 Sand Unit])."

2.
"Plaintiffs next contend that the lease should be cancelled because of defendants' failure to pay shut-in royalties. Although the Goldking Well for The Siphonina Davisi No. 3 produced as a unit well from May 1, 1975, the defendant, Marathon Oil, did not begin taking its production from the well until April 1, 1976. The delay was caused by the necessity of laying a pipeline from The Goldking Well to a gathering point. Plaintiffs contend that as a practical matter, . . . this well was. . . shut-in during this period of time, and that defendant Marathon therefore was contractually obliged to pay to plaintiffs' shut-in royalties.
Plaintiffs further contend that The S. Hebert Well was shut-in from September of 1974, until December of 1976, and that defendant *1289 Marathon was therefore obliged to pay shut-in royalties to plaintiffs.
In considering this contention the following provisions of the lease are pertinent:
Habendum Clause:
`This lease shall be for a term of One (1) Year from the date hereof (called "primary term") and so long thereafter as oil, gas or some other mineral is being produced from the land or from land pooled therewith, or drilling operations are conducted, as hereinafter provided for; all subject to the following conditions and agreements:'
Paragraph 2:
`Drilling or reworking operations on or production of oil, gas, sulphur or other minerals from/and included in such pooled unit shall have the effect of continuing this lease in force and effect after the primary term as to all of the land covered hereby (including any portion of said land not included in said unit) whether or not such operations were on or such production was from land covered hereby.'
As authority for this proposition [that shut-in royalties are due] plaintiffs rely upon the case of Nordon [Nordan]-Lawton Oil & Gas Corporation of Texas v. Preston J. Miller, 272 F.Supp. 125 (W.D.La., 1967). In that case, the Court held that although there was actual production attributable to a mineral lease, defendant nevertheless had the obligation to pay shut-in royalties where there was another well capable of producing in paying quantities shut-in on the leased property.
However, that case is not applicable to the present case. In the Nordon [Nordan]-Lawton case, the lease in question contained a provision that obliged the lessee to pay shut-in royalties in the event any well was shut-in, even if there was actual production attributable to the leased property. The lease under consideration in the present case contains no such provision.
It is the opinion of this Court that where there is actual production attributable to a mineral lease, there is no additional obligation to tender shut-in royalties in the event a second well capable of producing in paying quantities is shut-in on the leased premises. Where there is actual production in paying quantities, the necessity for constructive production does not exist. Bennett v. Sinclair Oil & Gas Company, 275 F.Supp. 886 (W.D.La., 1967).
Thus, even if this Court were to find that either the S. Hebert or the Goldking Well were shut-in, there still remained no obligation on the part of defendant Marathon to pay shut-in royalties to plaintiffs because there was actual production attributable to the leased premises (Siphonina Davisi No. 1 Sand Unit Well)."

3.
"Finally, plaintiffs contend that the lease should be cancelled because the S. Hebert well was not restored to production within sixty (60) days after the cessation thereof, (thereby terminating the lease) and that a release of the acreage lying within this unit (Siphonina Davisi No. 3 Sand Unit) should therefore have been granted within 120 days.
Plaintiffs rely upon the following provisions of the lease to substantiate this position:
`Notwithstanding anything to the contrary herein it is agreed between Lessor and Lessee as follows: That if by January 16, 1962, all or a part of the leased premises is not being held by unit operations (or by production), this lease may at the option of the Lessee, be continued in force and effect beyond said date by payments to Lessor in the amount of $333.33 per month, the first such payment being due on said date, and at the option of the Lessee, subsequent payments on the 16th day of each month thereafter until all or a part of leased premises has been included in a unit and being held by unit operations (or production) but in no event shall this lease be so continued in force and effect by said monthly payments beyond July 16, 1962.
In the event a portion, but not all, of the above described land is placed in a Unit or Units, Lessee agrees to file for record *1290 a release covering that portion of the land outside the unit or units, within 120 days after approval of such unit or units by the Commissioner of Conservation of the State of Louisiana.'
Plaintiffs contend that these provisions evidence an intent of the parties that no portion of the land shall be held without actual production, and that as a result, the leased acreage within The Siphonina Davisi No. 3 Sand Unit ( . . . [which acreage also lay within] the Cristellaria No. 6 Sand Unit) should have been released within 120 days after the S. Hebert well discontinued production. Plaintiffs therefore contend that these provisions were to have a continuing application.
These provisions were complied with when, on April 1, 1962, Ohio Oil Company released all acreage, lying outside of the Cristellaria No. 6 Sand Unit. It is the opinion of this Court that these provisions were to serve as a one time release requirement; that is, the release provision was to remain operative only until July 16, 1962."
We find that the above opinion of the trial court ably disposes of the plaintiffs' contentions and we adopt it as our own. With respect to the plaintiffs' last contention, we add that the lease calls for a release of all land outside the unit or units. There is no proof that the 8.5004 acres in litigation (Tract B) was ever outside a unit. As discussed in Footnote 1, supra, although the unit well for the Cristellaria No. 6 Sand Unit was shut-in, nothing in the record indicates that the Order creating the unit was ever dissolved. Absent proof to the contrary, therefore, we must conclude that the 8.5004 acre tract was at all times within a unit created by the state Department of Conservation, thereby rendering inapplicable the release clause of the lease.

DECREE
For the above and foregoing reasons, the judgment of the District Court is affirmed. All costs are assessed against plaintiffs-appellants.
AFFIRMED.
NOTES
[1] The District Court was under the impression that the Siphonina Davisi No. 3 Sand Unit was created to replace the Cristellaria No. 6 Sand Unit. However, the record shows that the Siphonina Davisi No. 3 Sand Unit was originally created on April 1, 1962, by Department of Conservation Order No. 367-D. Order No. 367-D-1, issued on May 1, 1975, simultaneously dissolved the unit created by Order No. 367-D and created anew a revised unit for the Siphonina Davisi No. 3 Sand which included the 9.9067 acres still held by Marathon (Tracts A and B). No mention is made of Cristellaria No. 6 in Order No. 367-D-1 and nothing else in the record suggests that Cristellaria No. 6 has been dissolved.
[2] Footnote by the Court of Appeal. As noted by then Judge Tate in Fremaux v. Buie, 212 So.2d 148 (La.App. 3rd Cir. 1968), the "clause is named after its creator, the late Lawrence G. Pugh, Sr., a distinguished attorney of Crowley, Louisiana. Its purpose is to avoid the consequences of the holding of Louisiana mineral law, see Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 [1947] and following, that production from a unit including a portion of a leased tract will maintain the lease in force as to all the lands covered by the lease." (Footnote 1 at page 149).